# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1006

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Cameron John Lewis, | * | |
| | * | |
| Appellant, | * | |
| _____ | | Appeals from the United States |
| | | District Court for the |
| No. 08-1085 | | District of Minnesota. |
| _____ | | |
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| J. Tyron Lewis, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 15, 2008
Filed: February 23, 2009 **(Corrected 2/25/09)**

_____

Before BYE, JOHN R. GIBSON, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Following a jury trial, appellants Cameron Lewis and J. Tyron Lewis were convicted of 31 counts and 30 counts, respectively, of mail fraud, wire fraud, bank fraud, conspiracy, and money laundering. Cameron Lewis moved for a new trial, and Tyron Lewis moved for judgment of acquittal or, in the alternative, a new trial. The district court[1] denied appellants' motions.

On appeal, Cameron Lewis argues that we should either reverse his convictions and remand for a separate trial or remand his case for resentencing. Tyron Lewis argues that we should either reverse his convictions outright or reverse his convictions and remand for a separate trial at which a willful blindness instruction is not given. We reject appellants' arguments and affirm the judgment of the district court.

## I. *Background*

In April 2000, Cameron Lewis formed the National School Fitness Foundation ("the Foundation") "to educate the general public relative to physical fitness and wellbeing and to fund and support school-based fitness programs that will provide maximum opportunity to improve national fitness levels and reduce disease." The Foundation's application for an exemption under 26 U.S.C. § 501(c)(3) stated that the organization would provide schools "a complete fitness system . . . at no cost," which would be accomplished by obtaining private contributions and government grants. Cameron Lewis served as the Foundation's president, and his father, Tyron Lewis, served as chairman of the Foundation's board of directors. Tyron Lewis pledged some of his farmland as collateral for loans funding the Foundation's start-up expenses.

The Foundation solicited schools to purchase its "Leadership in Fitness Training" ("L.I.F.T. America") Program. Schools purchasing the L.I.F.T. America

---

[1]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota.

Program received fitness equipment, staff training, and a physical fitness curriculum. Some schools also received a computer kiosk with which students could track their fitness progress. The cost of the L.I.F.T. America Program to participating schools ranged from approximately $112,000 to approximately $220,000.

Initially, Cameron Lewis and the Foundation's board of directors intended to donate the program to schools by obtaining sufficient contributions from public and private donors. But when fundraising efforts proved largely unsuccessful, the Foundation implemented a lease model so that the organization could continue to operate. The lease model, as proposed by the Foundation, would still provide the program to schools at little or no cost. Under the lease model, schools obtained their own financing for the cost of the program; the Foundation, in turn, promised to reimburse the schools for their loan payments so long as the schools reported student fitness data to the Foundation. The Foundation representatives assured school district personnel that the Foundation was financially stable and could fulfill its obligations, emphasizing that the organization received funding from governments and private donors. But by signing the Foundation-drafted contract, participating school districts acknowledged the risk that the Foundation might not be able to perform its contractual obligations.

The Foundation contracted with vendors for the provision of components and services for the L.I.F.T. America Program. For example, Alpha CIT supplied electronic components for the program, Compass Charitable Development provided fundraising services to the Foundation, and Canyon Creek Medical provided training and a medical safety bag to the schools. But these contractors were not entirely independent. Appellants had ownership interests in Alpha CIT and Compass Charitable Development, and Cameron Lewis received consulting fees from Canyon Creek.

Between December 2000 and April 2004, 625 schools from 20 states participated in the L.I.F.T. America Program. Because of its failed fundraising efforts, the Foundation relied on payments received from schools that had recently purchased the L.I.F.T. America Program to reimburse schools that had previously purchased the program. Bruce Olson, the Foundation's outside counsel, wrote a letter to Cameron Lewis in June 2001 in which Olson expressed concern that the operations of the Foundation were not consistent with the purposes and activities as set forth in the Foundation's § 501(c)(3) exemption application and recommended that the Foundation disclose to the IRS the nature of its operations. Olson also complained that he felt "very much in the dark" regarding the Foundation's operations, its status with the IRS, and its relationship with participating schools.

At the April 2002 meeting of the Foundation's board of directors, Olson questioned whether the Foundation's reimbursement obligations were reflected as liabilities in the Foundation's financial statements. The Foundation's CFO testified at trial that the reimbursement obligations were not included as liabilities in the financial statements because Cameron Lewis had told him that the obligations were not an actual liability but merely a promise to pay. Subsequently, in June 2002, appellants presided over a meeting of the National Scientific Advisory Board (NSAB), an advisory panel established by the Foundation to provide advice regarding relevant scientific issues. Explaining why the Foundation did not simply donate the L.I.F.T. America Program to schools, Cameron Lewis emphasized that the reimbursement model was necessary to ensure that the schools were financially responsible and reported their students' fitness data to the Foundation. Cameron Lewis informed the members of the NSAB that the program was ultimately provided free of charge so long as the schools complied with these requirements.

In August 2002, Olson wrote a letter to Cameron Lewis in which he stated that "[w]ithout infusion of new funds from new lease sources, the [Foundation's] program will implode, leaving millions of dollars of debt to hundreds of schools." Olson also

recommended that if it became substantially likely that the Foundation would be unable to perform its commitments, then the Foundation "should cease operations . . . rather than incur exposure to potential claims in the future." Finally, Olson raised concerns regarding the fairness of transactions entered into between the Foundation and the Lewis family and the accuracy of representations made by the Foundation to schools. In the latter half of 2002, the Foundation received more than $7 million from the sale of the L.I.F.T. America Program but less than $85,000 in contributions.

In a February 2003 letter to Tyron Lewis, Olson noted that Tyron Lewis had previously stated that he had read Olson's August 2002 letter to Cameron Lewis and was involved in addressing various issues raised therein. Olson wrote a letter to the members of the Foundation's board of directors in October 2003, expressing concern about the Foundation's financial condition. Specifically, Olson recommended that the board cease enrollment of new schools until the Foundation became financially solvent, provide full disclosure regarding the Foundation's financial condition and fundraising progress to all schools, ensure that no Foundation representative make commitments to schools that could not be met, and investigate whether any officer or other person had received compensation in excess of fair value. Olson warned that if the Foundation were to make commitments to reimburse schools "without a basis in fact that [the Foundation] has the ability to make those payments," then the Foundation, its board, and its employees would risk allegations of misrepresentation, liability for damages, and even criminal charges.

Olson terminated his representation of the Foundation in November 2003. Also in November, with both Cameron Lewis and Tyron Lewis in attendance, the Foundation's CFO outlined the organization's troubled financial state at a meeting of the Foundation's board of directors. Cameron Lewis expressed his desire to continue contracting with new schools, and the board decided to continue operations and revisit the issue in March 2004. In the latter half of 2003, the Foundation received more than $25 million from the sale of the L.I.F.T. America Program but only $8,200 in

contributions. According to the Foundation's CFO, the Foundation owed schools more than $77 million and had only slightly more than $10 million in cash by the end of 2003.

In January 2004, the Foundation's board of directors learned that the governor of Wisconsin had announced a plan under which the Foundation would contribute $5 million to implement the L.I.F.T. America Program in Wisconsin schools and the State of Wisconsin would help the Foundation raise $5 million from Wisconsin donors.

At a March 2004 meeting, the Foundation's board of directors decided to continue selling to schools under a modified model. At the meeting, the board directed the Foundation's CFO to pay $1.4 million to Lewis Farms, an entity controlled by Tyron Lewis, as partial repayment for the loans Tyron Lewis had made to the Foundation. The CFO testified that he was surprised by the board's order because Cameron Lewis had previously indicated that the loans had already been repaid. The board also ordered Cameron Lewis to repay purchases made by the Foundation on his behalf for powered parachutes, studio equipment, political contributions, a gun range lease, and an airplane, and it ordered both appellants to sell their interests in Alpha CIT and Compass Charitable Development. The Foundation stopped making reimbursement payments in March or April of 2004, and it filed for bankruptcy that year.

Appellants were charged jointly with mail fraud, wire fraud, bank fraud, conspiracy, and money laundering. They moved for severance well in advance of trial, but the district court denied their motions. Appellants renewed their severance motions shortly before the beginning of trial and throughout the trial, but the court denied these motions as well.

Appellants' joint trial began on October 31, 2006, and the jury began deliberations on November 29, 2006. The jury found Cameron Lewis guilty of (1) five counts of mail fraud, in violation of 18 U.S.C. §§ 2, 1341; (2) nine counts of wire fraud, in violation of 18 U.S.C. §§ 2, 1343; (3) one count of bank fraud, in violation of 18 U.S.C. §§ 2, 1344; (4) one count of conspiracy to commit mail fraud, wire fraud, and bank fraud, in violation of 18 U.S.C. § 1349; (5) one count of conspiracy to launder funds, in violation of 18 U.S.C. § 1956(h); (6) four counts of money laundering, in violation of 18 U.S.C. §§ 2, 1956(a)(1)(A)(i); and (7) ten counts of money laundering, in violation of 18 U.S.C. §§ 2, 1957. The jury found Tyron Lewis guilty of the same offenses except that it found him not guilty of one of the ten money laundering counts under 18 U.S.C. §§ 2, 1957.

Cameron Lewis moved for a new trial, arguing that the district court erred in denying his severance motions. Tyron Lewis moved for judgment of acquittal or, in the alternative, a new trial, arguing that the court erred in denying his severance motions, that the evidence was insufficient to support the jury's verdict, and that the court erred in giving the jury a willful blindness instruction. The court denied these motions. The court sentenced Cameron Lewis to 204 months' imprisonment, followed by five years of supervised release, sentenced Tyron Lewis to 68 months' imprisonment, followed by five years of supervised release, and ordered more than $39 million in restitution, for which appellants were jointly and severally liable.

## II. *Discussion*
### A. *Severance*

Appellants argue that they are entitled to new trials because the district court erred in denying their motions to sever. In conspiracy trials, our cases have tended to favor trying coconspirators jointly absent demonstrated prejudice. "We will not reverse a denial of a motion to sever unless the appellant demonstrates an abuse of discretion resulting in clear prejudice." *United States v. Flores*, 362 F.3d 1030, 1039 (8th Cir. 2004). Generally, "persons charged in a conspiracy or jointly indicted on

similar evidence from the same or related events should be tried together." *United States v. Adkins*, 842 F.2d 210, 211 (8th Cir. 1988). "The mere fact that one defendant tries to shift blame to another defendant does not mandate separate trials, as a codefendant frequently attempts to 'point the finger,' to shift the blame, or to save himself at the expense of the other." *Flores*, 362 F.3d at 1039–40 (internal citations and quotation marks omitted).

When defendants are properly joined, "there is a strong presumption for their joint trial, as it 'gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome.'" *Id.* at 1039 (quoting *United States v. Darden*, 70 F.3d 1507, 1528 (8th Cir. 1995)). This presumption can only be overcome if the prejudice is "severe or compelling." *United States v. Crumley*, 528 F.3d 1053, 1063 (8th Cir. 2008). "To demonstrate the severe or compelling prejudice necessary to show that the court abused its discretion in denying severance, 'a defendant must show that his defense was irreconcilable with that of the codefendant or that the jury was unable to compartmentalize the evidence.'" *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir. 1997) (quoting *United States v. Bordeaux*, 84 F.3d 1544, 1547 (8th Cir. 1996)).

1. *Irreconcilable Defenses*

Appellants argue that severance was required because their defenses were irreconcilable. They contend that Cameron Lewis's defense that no fraud occurred was irreconcilable with Tyron Lewis's defense that he had been ignorant of Cameron Lewis's misconduct and had relied on Cameron Lewis's representations.

We have stated that "[t]he existence of antagonistic defenses does not require severance unless the defenses are actually irreconcilable." *United States v. Johnson*, 944 F.2d 396, 402 (8th Cir. 1991). "[A] defense is irreconcilable when the jury, to believe the core of one defense, must necessarily disbelieve the core of another." *Id.* at 403. Antagonistic defenses require severance "only when there is a danger that the

jury will unjustifiably infer that this conflict . . . alone demonstrates that both are guilty." *United States v. Ortiz*, 315 F.3d 873, 898 (8th Cir. 2002) (internal quotation marks omitted). "It is not sufficient that one defendant be taking the position that he knew nothing of the crime while asserting that his codefendant was involved." *United States v. Lynch*, 800 F.2d 765, 768 (8th Cir. 1986).

In this case, the jury was not required to disbelieve the core of one appellant's defense in order to believe the core of the other appellant's defense. Although Tyron Lewis's counsel did argue at trial that Tyron Lewis had been ignorant of Cameron Lewis's misconduct and had relied on Cameron Lewis's representations, the crux of Tyron Lewis's defense was that the government failed to prove that he intended to defraud anyone, was aware of any crimes, or agreed to commit any crimes. This defense was not actually irreconcilable with Cameron Lewis's defense that no fraud was committed. In this case, the jury could weigh the evidence against each defendant in relative isolation and reach independent verdicts on the guilt of each, accepting or rejecting their separate defenses to the specific charges against them.

### 2. *Jury's Ability to Compartmentalize the Evidence*

Emphasizing the length and complexity of the trial and the disparity in the quantum of evidence, Tyron Lewis argues that he was entitled to severance because the jury was unable to compartmentalize the evidence. "In assessing the jury's ability to compartmentalize the evidence against joint defendants, we consider the complexity of the case, whether any of the defendants was acquitted, and the adequacy of the jury instructions and admonitions to the jury." *United States v. Ghant*, 339 F.3d 660, 666 (8th Cir. 2003).

Neither the length nor the complexity of the trial rendered severance necessary. In *United States v. Frank*, we held that the jury was able to compartmentalize the evidence against two defendants in a six-day trial involving 51 counts. 354 F.3d 910, 920–21 (8th Cir. 2004). Applying plain error review because the appellant had not

renewed his pretrial motion to sever, we emphasized that (1) all of the counts were connected by the government's theory and the defendants' defense, (2) the district court instructed the jury to consider the evidence against the defendants separately, and (3) one of the defendants was acquitted of a count on which the other defendant was convicted. *Id.* As in *Frank*, appellants' trial included counts connected by the government's theory and appellants' defenses. The district court instructed the jury to assess appellants' guilt separately during the government's case and in final instructions. The jury followed the court's instruction, convicting Cameron Lewis of a count on which Tyron Lewis was acquitted.

We also reject Tyron Lewis's argument that the jury was unable to compartmentalize the evidence because there was more evidence of Cameron Lewis's guilt than of his own guilt. "The preference for joint trials of defendants jointly indicted, particularly where conspiracy is charged, is not limited by any requirement that the quantum of evidence of each defendant's culpability be equal." *United States v. Jackson*, 549 F.2d 517, 525 (8th Cir. 1977) (internal citation omitted). Tyron Lewis was not entitled to severance simply because the evidence against him was less damaging than was the evidence against Cameron Lewis. *See United States v. Hively*, 437 F.3d 752, 765 (8th Cir. 2006) ("Severance is never warranted simply because the evidence against one defendant is more damaging than that against another, even if the likelihood of the latter's acquittal is thereby decreased." (internal citation omitted)). The record does not indicate that the evidence "was of such a nature that the jury could not compartmentalize it" appropriately. *Jackson*, 549 F.2d at 526.[2]

---

[2]Tyron Lewis's argument that he was entitled to severance because the joint trial resulted in the exclusion of a statement he gave to an FBI agent is without merit. We have stated that severance may be necessary "when a joint trial denies a defendant exculpatory evidence that would be available if he was tried alone." *Flores*, 362 F.3d at 1040. But because the agent was not called as a witness and the statement was not offered at trial, the district court never ruled on the statement's admissibility. We therefore cannot say that the joint trial denied Tyron Lewis the opportunity to present the statement he gave to the FBI agent.

### 3. *Bruton v. United States*

Cameron Lewis argues that severance was required under *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the Supreme Court held that the admission of a nontestifying defendant's statement inculpating a codefendant violates the codefendant's Confrontation Clause rights, notwithstanding a curative instruction. *Id.* at 135–36. But not all such instances require reversal. The Supreme Court has stated that "[i]n some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida*, 405 U.S. 427, 430 (1972). Likewise, we have recognized that "there is no *Bruton* error when the erroneously admitted evidence is 'merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury.'" *United States v. Coleman*, 349 F.3d 1077, 1086 (8th Cir. 2003) (quoting *Brown v. United States*, 411 U.S. 223, 231 (1973)).

Cameron Lewis argues that *Bruton* was violated by the admission of the Foundation consultant Mark Nyman's testimony that Tyron Lewis (1) seemed surprised that an audit had not been completed, (2) told him that "there were problems with record keeping with Cameron," and (3) acknowledged "that some mistakes [had] been made." We need not address whether the admission of Nyman's testimony violated *Bruton* because any *Bruton* error was harmless. Tyron Lewis's statements referenced in Nyman's testimony are insufficiently prejudicial to warrant reversal. At most, they suggest that Cameron Lewis acted sloppily, not fraudulently. Indeed, in his closing argument, Cameron Lewis's counsel admitted that Cameron Lewis "got ahead of himself" and "made a lot of mistakes." And, to the extent that the statements can be construed as inculpating Cameron Lewis, they are merely cumulative of other evidence admitted at trial.[3]

---

[3]We also reject Cameron Lewis's contention, raised at oral argument, that it was the father-son relationship that rendered the joint trial so prejudicial as to require severance. Cameron Lewis cited no authority—and even admitted that there is

Because appellants' defenses were not actually irreconcilable, the jury was able to compartmentalize the evidence, and any *Bruton* error was harmless, we hold that the district court did not err in denying appellants' motions to sever.

## B. *Sufficiency of the Evidence*

Tyron Lewis argues that the district court erred in denying his motion for judgment of acquittal or, in the alternative, a new trial because there was insufficient evidence to support the jury's verdict. We review the denial of a motion for judgment of acquittal de novo. *Hively*, 437 F.3d at 760. When a motion for judgment of acquittal is based on evidentiary insufficiency, we "view[] the evidence in the light most favorable to the verdict" and "must uphold the verdict if the evidence so viewed is such that there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendants guilty beyond a reasonable doubt." *United States v. Vig*, 167 F.3d 443, 447 (8th Cir. 1999).

Tyron Lewis's principal argument in support of his evidentiary insufficiency claim is that there is no evidence that he either was involved in failing to disclose information or was aware of the Foundation's misrepresentations to schools or other parties. But his argument does not square with the factual record before the jury. Tyron Lewis knew that the Foundation continued to market the L.I.F.T. America Program to school districts despite the organization's deteriorating financial condition. He also was warned by Olson to ensure that the Foundation representatives not make financial commitments to schools that could not be met and to provide all schools with full disclosure regarding the Foundation's financial condition and fundraising progress. Furthermore, as the district court observed, Tyron Lewis participated in the Foundation's fundraising efforts and was warned by Olson to stop contracting with new schools until the Foundation became financially solvent. Finally, Tyron Lewis received a $1.4 million loan repayment from the Foundation after Cameron Lewis had

none—supporting the conclusion that a familial relationship between codefendants should be dispositive in a court's severance analysis.

informed the Foundation's CFO that the loan had no outstanding balance. Because our review of the record indicates that a reasonable jury could have found Tyron Lewis guilty beyond a reasonable doubt, we hold that the district court did not err in denying his motion for judgment of acquittal.

"When faced with a motion for a new trial, unlike a motion for judgment of acquittal, a district court is permitted to weigh the evidence and judge witness credibility for itself in determining if there may have been a miscarriage of justice such that a new trial is required." *United States v. Samuels*, 543 F.3d 1013, 1019 (8th Cir. 2008). "[M]otions for new trials based on the weight of the evidence generally are disfavored, and the district court's authority to grant a new trial should be exercised sparingly and with caution." *United States v. Johnson*, 474 F.3d 1044, 1050–51 (8th Cir. 2007). We review the denial of a motion for a new trial for an abuse of discretion. *United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). In light of the evidence supporting the jury's guilty verdict, we are convinced that no miscarriage of justice occurred in this case. Accordingly, we hold that the district court did not abuse its discretion in denying Tyron Lewis's motion for a new trial on the basis of insufficient evidence.

## C. *Willful Blindness Instruction*

Tyron Lewis next argues that he is entitled to a new trial because the district court erred in giving the jury a "willful blindness" instruction over his objection. We review a district court's instructions to the jury for abuse of discretion. *United States v. Whitehill*, 532 F.3d 746, 751 (8th Cir. 2008).

The district court instructed the jury as follows:

The government may prove that the defendant acted knowingly by proving beyond a reasonable doubt that the defendant deliberately closed his eyes to what would otherwise have been obvious to him. No one can avoid responsibility for a crime by deliberately ignoring what is obvious.

-13-

A finding beyond a reasonable doubt of an intent of a defendant to avoid knowledge or enlightenment would permit the jury to find knowledge.

Stated another way, a person's knowledge of a particular fact may [] be shown from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact.

Of course, it is entirely up to you as to whether to find any deliberate ignorance or deliberate closing of the eyes and any inferences to be drawn from any such evidence.

A willful blindness "instruction allows the jury to impute knowledge to [a defendant] of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlightenment." *United States v. Zimmerman*, 832 F.2d 454, 458 (8th Cir. 1987). "The instruction should not be given . . . when the evidence 'points solely to either actual knowledge or no knowledge of the facts in question.'" *United States v. Regan*, 940 F.2d 1134, 1136 (8th Cir. 1991) (quoting *United States v. Hiland*, 909 F.2d 1114, 1130 (8th Cir. 1990)). But "even where there is evidence of actual knowledge, . . . a willful blindness instruction is proper if there is sufficient evidence to support an inference of deliberate ignorance." *Hiland*, 909 F.2d at 1130–31. When reviewing a district court's decision to give a willful blindness instruction, we "view[] the evidence and any reasonable inference from that evidence in the light most favorable to the government." *United States v. Woodard*, 315 F.3d 1000, 1003–04 (8th Cir. 2003).

We have recognized that a willful blindness "instruction is particularly appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." *Regan*, 940 F.2d at 1136. The district court's decision to give a willful blindness instruction is supported by Tyron Lewis's defenses and the evidence presented in this case, as Tyron Lewis denied that he was aware of any criminal activity and the evidence in the record supports the conclusion that he either knew of the illegalities surrounding the Foundation or was deliberately ignorant of

them. We hold that the district court did not abuse its discretion in giving the jury a willful blindness instruction.

D. *Cameron Lewis's Sentence*

Cameron Lewis challenges his sentence on several grounds and argues that we must remand for resentencing if we do not reverse his convictions. In the presentence investigation report (PSR), the probation officer calculated Cameron Lewis's Guidelines range to be 324 to 405 months. But the district court granted a downward variance to 204 months, followed by five years of supervised release, and ordered restitution exceeding $39 million.

We review the district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings for clear error. *United States v. Burnette*, 518 F.3d 942, 945 (8th Cir. 2008). "When we review the imposition of sentences, whether inside or outside the Guidelines range, we apply 'a deferential abuse-of-discretion standard.'" *United States v. Hayes*, 518 F.3d 989, 995 (8th Cir. 2008) (quoting *Gall v. United States*, 128 S. Ct. 586, 591 (2007)). The first step in this inquiry is to "ensure that the district court committed no significant procedural error." *Gall,* 128 S. Ct. at 597. If "the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed." *Id.*

1. *Procedural Error*

Cameron Lewis first argues that the district court committed procedural error by including schools from outside Minnesota in its calculation of the loss amount and the number of victims for enhancement of his offense level. The court applied a 22-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(L) because the offense involved a loss of approximately $30 million and a six-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(C) because the offense involved 294 victim school districts.

According to Lewis, the loss and victim calculations should be based only on the Minnesota school districts specifically identified in the indictment.

The Guidelines contain no requirement that the sources of the loss and victim calculations be specifically identified in the indictment. Furthermore, in *United States v. DeRosier*, we rejected a defendant's argument that a transaction should have been excluded from the district court's loss calculation because it "was not specifically detailed in the indictment." 501 F.3d 888, 896 (8th Cir. 2007). We explained that "we take a broad view of what conduct and related loss amounts can be included in calculating loss." *Id.* Finally, although only Minnesota school districts are specifically identified in the indictment, the indictment does allege that Cameron Lewis "engage[d] in a scheme to defraud school districts . . . located in Minnesota and across the United States."

Cameron Lewis also argues that the district court committed procedural error by failing to consider "the need to avoid unwarranted sentence disparities" under 18 U.S.C. § 3553(a)(6). "A sentence is procedurally unreasonable if the district court, *inter alia*, 'fail[ed] to consider the § 3553(a) factors . . . .'" *United States v. Perkins*, 526 F.3d 1107, 1110 (8th Cir. 2008) (quoting *Gall*, 128 S. Ct. at 597)). But "[i]f a district court 'references some of the considerations contained in § 3553(a), we are ordinarily satisfied that the district court was aware of the entire contents of the relevant statute.'" *Id.* at 1111 (quoting *United States v. White Face*, 383 F.3d 733, 740 (8th Cir. 2004)). "A district court is not required to make specific findings; all that is generally required to satisfy the appellate court is evidence that the district court was aware of the relevant factors." *Id.* at 1110.

The district court specifically addressed certain § 3553(a) factors, granting Cameron Lewis a substantial downward variance because the Guidelines sentence was greater than necessary "to promote respect for the law" and "to protect the public." 18 U.S.C. § 3553(a)(2)(A), (C). And Cameron Lewis's attorney argued at the sentencing

hearing that the court should consider the need to avoid sentencing disparities in imposing its sentence. Accordingly, the court "was aware of the relevant factors," *Perkins*, 526 F.3d at 1110, and did not commit procedural error.

### 2. *Substantive Unreasonableness*

Cameron Lewis next argues that his sentence is substantively unreasonable, but he proffers no support for his claim other than to reiterate his argument that the district court failed to consider all of the § 3553(a) factors. Because we previously concluded the district court considered all of the § 3553(a) factors, Lewis's substantive unreasonableness argument is without merit.

### 3. *Sixth Amendment*

Cameron Lewis also argues that the district court violated his Sixth Amendment rights by basing its loss calculation on facts not found by the jury. But the Supreme Court has held that a sentencing court may "take account of factual matters not determined by a jury." *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2465 (2007). Likewise, we have recognized that "[j]udicial fact-finding is permitted provided that it is done with the understanding that the guidelines are to be applied in an advisory fashion." *United States v. Morell*, 429 F.3d 1161, 1164 (8th Cir. 2005). Because the district court applied the Guidelines "in an advisory fashion," *id.*, its reliance on facts not found by the jury did not violate the Sixth Amendment.

### 4. *Amount of Restitution*

Finally, Cameron Lewis argues that the discrepancy between the district court's $30 million loss calculation for purposes of computing his adjusted offense level and its $39 million restitution order requires remand for resentencing. "We review a district court's finding of loss relating to restitution for clear error." *United States v. May*, 413 F.3d 841, 848 (8th Cir. 2005).

In Cameron Lewis's PSR, the probation officer calculated a loss amount of $39,158,038.49 based on the finding that the Foundation committed to pay school districts approximately $115 million. But at the sentencing hearing, the district court declined to use $115 million for purposes of determining Lewis's adjusted offense level because that figure was derived from a financial summary that was not admitted as evidence at trial.

The trial record showed that the Foundation promised to pay school districts approximately $99.4 million but made only approximately $31.4 million in reimbursement payments. Rounding these figures to $100 million and $35 million, the district court concluded that the school districts were not reimbursed for $65 million. The court then reduced $65 million by 50 percent to account for the value of the equipment and services received by the schools, resulting in a $32.5 million loss, but the court rounded this figure down to $30 million. When setting forth its restitution order, the district court stated as follows: "The terms and conditions of supervised release will be that you pay restitution in the amount of 30—we'll go with that figure, $39,158,038.49."

"A district court's determination of loss need not be precise, although it must reflect a reasonable estimate of the loss." *United States v. Boesen*, 541 F.3d 838, 851 (8th Cir. 2008). In light of the approximations and rounding involved in the district court's calculation of the amount of loss, we cannot say that it clearly erred in ordering Cameron Lewis to pay more than $39 million in restitution—an amount equivalent to the probation officer's calculation.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____