# United States Court of Appeals

## For the Eighth Circuit

_____

No. 19-1820

_____

United States of America

*Plaintiff - Appellee*

v.

Leonardo Antonio Magallon

*Defendant - Appellant*

_____

No. 19-1902

_____

United States of America

*Plaintiff - Appellee*

v.

Jose Ruben Garcia Ortiz

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: September 24, 2020
Filed: January 8, 2021

_____

Before SMITH, Chief Judge, BENTON and KOBES, Circuit Judges.

_____

SMITH, Chief Judge.

In 2018, a grand jury indicted Leonardo Antonio Magallon ("Magallon") and Jose Ruben Garcia Ortiz ("Garcia Ortiz") with conspiracy to distribute 500 grams or more of a mixture and substance containing methamphetamine and at least 50 grams of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Garcia Ortiz was additionally indicted with possession with intent to distribute at least 500 grams of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). Garcia Ortiz conditionally pleaded guilty to the conspiracy charge, and the district court[1] sentenced him to 28 months' imprisonment. The district court sentenced Magallon to 164 months' imprisonment after a jury convicted him of conspiracy.

Garcia Ortiz appeals the district court's denial of his motion to suppress evidence,[2] and Magallon appeals the district court's denials of his motion for a new trial and motion for judgment of acquittal. We affirm.

## I. *Background*
### A. *Underlying Facts*

Following an investigation of Carlos Estrada Camarena ("Estrada Camarena"), a suspected methamphetamine distributor, a grand jury indicted

_____

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

[2]Garcia Ortiz also appealed the district court's failure to apply a greater role reduction at sentencing. However, Garcia Ortiz finished serving his sentence and thus conceded at oral argument that this issue was moot.

Estrada Camarena, Magallon, and Garcia Ortiz with conspiracy to distribute 500 grams or more of a mixture and substance containing methamphetamine and at least 50 grams of actual methamphetamine. The grand jury also indicted Estrada Camarena and Garcia Ortiz with possession with intent to distribute at least 500 grams of a mixture and substance containing methamphetamine.

In late 2017, a confidential defendant (CD) identified Estrada Camarena to law enforcement as a methamphetamine distributor out of Las Vegas, Nevada. Estrada Camarena was also connected to Darwin Salas ("Darwin"), another methamphetamine distributor out of Des Moines, Iowa. The CD identified Estrada Camarena in a photo. Though the CD had never purchased methamphetamine from Estrada Camarena, he had discussed doing business with him on prior occasions. At law enforcement's direction, the CD made recorded calls to Estrada Camarena to arrange a methamphetamine delivery.

However, because the CD was in jail at the time, he introduced a cooperating source (CS) to Estrada Camarena, telling Estrada Camarena that the CS was a family member who could be trusted to receive delivery of the drugs from Estrada Camarena. Law enforcement ultimately arranged for Estrada Camarena to deliver ten pounds of methamphetamine to the CS in Des Moines. But before commencing the delivery, Estrada Camarena required the CS to pay for the drugs and instructed her to deposit the money into the bank account he provided. Magallon opened that account on February 2, 2018, a day after texting Estrada Camarena to call him. Estrada Camarena gave Magallon's account number to the CS. Law enforcement arranged for two payments ($2,500 each) to be deposited into Magallon's account: one on March 15, 2018, and the other on March 16, 2018. After each transfer, Estrada Camarena notified Magallon, who withdrew the money following each notification.

Magallon purchased a black Infiniti in March 2018. On the same day that he withdrew the first $2,500 deposit, Magallon purchased car insurance for the Infiniti under the name "Jacob Diaz." Additionally, Magallon asked an associate to make

-3-

him a fake identification card, using his photograph but with the name "Jacob Justin Diaz." On April 2, 2018, prior to leaving for Des Moines, Estrada Camarena texted Magallon, asking if Magallon had $1,000 "[f]or us to leave." Trial Tr., Vol. II, at 236, *United States v. Magallon*, 4:18-cr-00080-JAJ-CFB-2 (S.D. Iowa 2019), ECF No. 210. Magallon responded that he did not have any money. Estrada Camarena told Magallon he had "put in the order" and "as soon as I get them, outta here." *Id.* at 236–37.

Estrada Camarena recruited Garcia Ortiz to drive a separate car and follow him and Magallon with the drugs from Las Vegas to Des Moines. Garcia Ortiz testified that late on April 6, 2018, he met Estrada Camarena and Magallon in a parking lot where Estrada Camarena removed a plastic grocery sack containing methamphetamine from the trunk of Magallon's Infiniti and placed it in the trunk of Garcia Ortiz's Lexus. Garcia Ortiz also explained that you "[c]ouldn't really see inside" the grocery bags. *Id.* at 359. Garcia Ortiz then drove the Lexus containing the drugs to Des Moines. Magallon drove the Infiniti to Des Moines, accompanied by Estrada Camarena. After arrival, Garcia Ortiz parked the Lexus at an apartment complex close to Darwin's residence and joined Estrada Camarena and Magallon there.

## 1. *Surveillance Investigation*

On April 8, 2018, Estrada Camarena texted the CS that he was in Des Moines and wanted to meet. Law enforcement established surveillance at the residence of Darwin, who they knew to be one of Estrada Camarena's associates. They observed Estrada Camarena in the driveway and identified him as the same person in the photo the CD identified. Estrada Camarena and the CS arranged to meet within a couple of miles of Darwin's house.

Law enforcement observed a male exit Darwin's residence and depart in a black Infiniti with an Arizona license plate. They observed the Infiniti drive at excessive speeds, make rapid turns, and eventually park in a median before making

a U-turn and speeding away. Law enforcement conducted a traffic stop and identified Magallon as the driver. He was alone.

Magallon consented to a search of his vehicle. The search revealed the following: (1) a Wells Fargo check portfolio for the same account into which Estrada Camarena had directed the CS to deposit drug payments, and (2) a fake identification card bearing Magallon's photo but a false name. There, law enforcement also searched his cellular phones.[3]

### 2. *Post*-Miranda[4] *Interview of Magallon*

After his arrest, Magallon consented to a post-*Miranda* interview and provided the following information: Magallon arrived in Des Moines, Iowa, the previous night on April 7, 2018, with his friend Estrada Camarena after driving directly from Las Vegas, Nevada.

Magallon stated that in Des Moines he visited Estrada Camarena's friend, who he described as a "fat bald guy," who owned a soccer team and computer software and music promotion businesses and lived near 17th Street in Des Moines. Final Presentence Investigation Report (PSR) at 6, ¶ 19, *United States v. Magallon*, 4:18-cr-00080-JAJ-CFB-2 (S.D. Iowa 2019), ECF No. 174. According to law enforcement, Magallon accurately described Darwin. While in detention, Magallon placed several calls, which the prison recorded. In one, he told his girlfriend he was being paid for the trip and that "[t]here was nothing nowhere." Trial Tr., Vol. III, at 435, *United States v. Magallon*, 4:18-cr-00080-JAJ-CFB-2 (S.D. Iowa 2019), ECF No. 211. Additionally, he indicated to his girlfriend that she should be cautious about what she said over the phone.

---

[3]Law enforcement searched Magallon's three phones pursuant to search warrants and Magallon's consent to search.

[4]*Miranda v. Arizona*, 384 U.S. 436 (1966).

### 3. *Arrest of Estrada Camarena and Garcia Ortiz*

Meanwhile, law enforcement continued surveillance at Darwin's residence. Law enforcement believed that Estrada Camarena came to town with Magallon to deliver ten pounds of methamphetamine. In addition, they knew that the suspect's activity focused on Darwin's residence and that the methamphetamine was not in Magallon's vehicle. Law enforcement deduced that the drugs were either at Darwin's residence or in another vehicle coming from the residence.

When law enforcement observed three Hispanic males get into a GMC Sierra and depart from the residence, they conducted an investigative stop of the vehicle. Anthony Salas ("Anthony"), Darwin's younger brother and driver of the GMC; Estrada Camarena; and Garcia Ortiz occupied the vehicle. Law enforcement placed them in separate police vehicles for questioning.

First, they interviewed Anthony, who identified Estrada Camarena and Garcia Ortiz as his older brother's friends. Anthony told Special Agents Tom Smith and Lonny Namanny that Estrada Camarena had a duffle bag at the residence he shared with Darwin. Anthony gave the officers consent to retrieve the duffle bag from the residence. At the residence, officers spoke with Darwin and collected the bag. They then returned to the traffic-stop location with the bag. Anthony also consented to the officers' search of his cell phone.

In the meantime, law enforcement had handcuffed Garcia Ortiz and placed him in the backseat of a locked patrol car. Because officers first completed conversing with Anthony and Estrada Camarena, law enforcement did not begin to question Garcia Ortiz for nearly an hour. Then, Agent Smith entered the back of the patrol car and questioned Garcia Ortiz. The car's dash camera recorded three different sessions in the interview.

During the first questioning, which lasted approximately 17 minutes, Agent Smith asked Garcia Ortiz for his name, date of birth, social security number, where he was from, and where he lived now. Garcia Ortiz cooperated. Agent Smith also

asked Garcia Ortiz for his family members' names, his ex-girlfriend's name, his phone number, how long Garcia Ortiz had been in Des Moines, and who he knew in Des Moines. In his reply, Garcia Ortiz fabricated a story about hitchhiking to Des Moines and eventually staying with Estrada Camarena and Darwin. He claimed to have first met them at a club in Las Vegas.

Agent Smith also asked Garcia Ortiz about the car's other occupants. During this exchange, Garcia Ortiz asked, "Are these guys like in some trouble or something?" Gov't's Surreply to Def.'s Reply, Ex. 1 (CD) at 1:11:20, *United States v. Garcia Ortiz*, 4:18-cr-00080-JAJ-CFB-3 (S.D. Iowa 2018), ECF No. 64. Agent Smith responded, "Yeah and you might be too, but you got to tell us what's really going on." *Id.* at 1:11:22. Garcia Ortiz indicated he would do whatever he could do to help. Next, Agent Smith asked, "Did you drive a car out here for them?" *Id.* at 1:11:36. Garcia Ortiz said "no" and that they did not pay him to do so. *Id.* at 1:11:45. This specific exchange lasted about two minutes.

Agent Smith asked Garcia Ortiz whether he knew about Darwin's and Estrada Camarena's business dealings. Garcia Ortiz avoided answering by changing the subject. Agent Smith ended this first exchange by exiting the vehicle to confer with other officers who informed him that they discovered a white Lexus in a nearby parking lot. The car bore a Nevada license plate and was registered to "Maria Tapia." Agent Smith re-entered the vehicle after about three minutes and asked Garcia Ortiz if he knew Maria Tapia and if she drove a white Lexus. Garcia Ortiz said that they purchased the car together. Agent Smith asked if Garcia Ortiz had the keys for the Lexus. Garcia Ortiz answered "yeah" and told Agent Smith they were in his pocket. *Id.* at 1:20:55. Agent Smith asked him, "Can I grab those keys real quick?" *Id.* at 1:21:02. Garcia Ortiz, after briefly hesitating, responded "sure." *Id.* at 1:21:04.

When asked about the Lexus's current location, Garcia Ortiz lied, stating that it was in Las Vegas. Agent Smith, knowing other officers had found the Lexus nearby, questioned, "are you sure?" and "would it shock you if it was here in Iowa?" *Id.* at 1:21:04–1:21:34. Garcia Ortiz answered "yeah." *Id.* at 1:21:37. Agent Smith

then explained to Garcia Ortiz that "[he] might be shocked to know there is a Lexus registered to Maria here in Iowa." *Id.* at 1:21:41–1:21:46. Again, he asked if Garcia Ortiz was sure he wanted to stick to the story that he hitchhiked to Iowa. Garcia Ortiz responded "yeah." *Id.* at 1:21:58.

Then, Agent Smith asked, "If the keys in your pocket open the white Lexus, can we take a look in there?" *Id.* at 1:22:04. Garcia Ortiz initially asserted, "that's not my property so whatever is in there is not mine" but ultimately changed his story and told Agent Smith that he had bags full of clothes in the car. *Id.* at 1:22:10; 1:22:30. Agent Smith explained that he "just want[ed] to make sure that [they got] whatever bag [was his to him], so that [he could] be on [his] merry way." *Id.* at 1:22:49.

Agent Smith again sought Garcia Ortiz's consent, asking "Can we go get your bags of clothes to give to you?" *Id.* at 1:23:05. Garcia Ortiz questioned, "Do I really need them . . . do I really need them to go to jail?" *Id.* at 1:23:09. Agent Smith responded, "I'm not planning to take you to jail unless you want to go there. And even if you want to go there, you've got to tell us a little bit more than what you've told us." *Id.* at 1:23:19. Again, he asked, "Can we go get your clothes from inside that car?" *Id.* at 1:23:34. Garcia Ortiz shook his head, indicating yes. To clarify, Agent Smith asked, "Yes, that's okay?" *Id.* at 1:23:46. Garcia Ortiz audibly responded "yeah." *Id.* at 1:23:47. Then, Agent Smith instructed another officer to retrieve the keys from Garcia Ortiz's pocket from the other side of the vehicle.

Agent Smith also asked whether anyone else put something in the car; Garcia Ortiz said that Estrada Camarena had items in the car as well. When Agent Smith asked whether there was "something else we need to know about what's in that car," *id.* at 1:24:41, Garcia Ortiz suggested, "I guess you guys will find out," *id.* at 1:26:01. Agent Smith offered, "Would you rather us go look in there [the car] and come back and talk?" *Id.* at 1:26:19. Garcia Ortiz responded, "You guys are welcome to do whatever you guys feel like doing." *Id.* at 1:26:23. This second interaction lasted about seven minutes before Agent Smith again exited the vehicle.

Officers searched the Lexus while Garcia Ortiz remained handcuffed in the back of the patrol car. They found five bundles of methamphetamine in the Lexus. After about two minutes, Agent Smith returned a third time to speak with Garcia Ortiz. Agent Smith explained that he had some more questions for Garcia Ortiz; that he was being detained for questioning; and that he was not under arrest at that time, although "that c[ould] change." *Id.* at 1:29:35.

He then read the *Miranda* warnings to Garcia Ortiz and asked if he understood. Garcia Ortiz nodded his head, indicating he understood. Agent Smith asked Garcia Ortiz to clarify "yes or no," to which Garcia Ortiz again nodded his head indicating he did understand and said, "yeah." *Id.* at 1:30:28. Then, Agent Smith asked if Garcia Ortiz was willing to answer some questions, to which Garcia Ortiz again clearly indicated his willingness with a head nod.

Agent Smith began, "I want to hear from you: what's yours in the car, what's in the car, and the rest of your story." *Id.* at 1:30:57. Garcia Ortiz took a while to respond, so Agent Smith asked if he was "afraid of these people." *Id.* at 1:31:28. Garcia Ortiz indicated he was, and Agent Smith explained "I'll tell you one thing, you may not be coming with us today." *Id.* at 1:31:31. Garcia Ortiz then explained that he traveled from Las Vegas to Des Moines with Estrada Camarena as payment for a debt Garcia Ortiz's brother owed Estrada Camarena. Garcia Ortiz believed Estrada Camarena agreed to that plan because he had a clean driving record. This third, but post-*Miranda*, exchange lasted approximately 20 minutes.

## B. *Procedural History*

On April 25, 2018, a two-count indictment was filed, charging Garcia Ortiz and codefendants Estrada Camarena and Magallon with conspiracy to distribute 500 grams or more of methamphetamine. Garcia Ortiz and Estrada Camarena were additionally charged with possession with intent to distribute at least 500 grams of methamphetamine.

## 1. *Garcia Ortiz*

On November 26, 2018, Garcia Ortiz pleaded guilty to count one of the two-count indictment against him. On December 14, 2018, the district court accepted his plea. Pursuant to a written plea agreement with Garcia Ortiz, the government dismissed count two at sentencing. On April 12, 2019, the court sentenced Garcia Ortiz to 28 months' imprisonment and two years of supervised release. The plea agreement expressly reserved Garcia Ortiz's right to appeal the denial of his motion to suppress, allowing him to withdraw his guilty plea if he prevailed.

In his motion to suppress, Garcia Ortiz challenged the warrantless stop of the GMC Sierra in which he was a passenger, moved to suppress the statements he made that day both before and after he received *Miranda* warnings, and sought to suppress the evidence obtained from the search of his Lexus.

The district concluded that (1) the traffic stop was supported by reasonable suspicion, (2) Garcia Ortiz was in "custody" for purposes of *Miranda* and suppressed his pre-*Miranda* statements, and (3) Garcia Ortiz voluntarily gave consent to search the Lexus.

First, the district court concluded that the traffic stop was supported by reasonable suspicion because the officers reasonably suspected the passengers were involved in distributing methamphetamine. Although it noted that the investigatory detention lasted longer than the average *Terry*[5] stop, the court found that

> there was a wealth of information and leads to follow and the police acted diligently in doing so. Simply the process of confirming or dispelling the suspicion of a connection between the individuals identified in the findings of fact above was complex and took some time. . . . At almost every step, the suspicion about the detainees increased and ultimately matured into probable cause to arrest.

---

[5]*Terry v .Ohio*, 392 U.S. 1 (1968).

Order Granting in Part and Den. in Part Mot. to Suppress at 6–7, *United States v. Garcia Ortiz*, No. 4:18-cr-00080-JAJ-CFB-3 (S.D. Iowa Nov. 13, 2018), ECF No. 71.

Second, the court concluded that Garcia Ortiz was "interrogated" and "in custody" because he had been detained in the back of a police car for an hour with his hands handcuffed behind his back. *Id.* at 7. He was questioned multiple times but did not receive the *Miranda* warnings until the third time Agent Smith spoke to him. Thus, the court suppressed his statements made after the routine biographical questions and before the *Miranda* warnings. Specifically, it emphasized the Supreme Court's holding in *Oregon v. Elstad*, 470 U.S. 298 (1985), that an unwarned custodial interrogation does not always invalidate a subsequent custodial interrogation when *Miranda* warnings are provided. Based on *Elstad*, and the court's finding that Garcia Ortiz voluntarily and knowingly waived his *Miranda* rights when interrogated the third time, the court denied Garcia Ortiz's motion to suppress his post-*Miranda* admissions.

Third, the court found that Garcia Ortiz orally gave voluntary consent to search the Lexus. The court analyzed the factors described in *United States v. Comstock*, 531 F.3d 667, 676–77 (8th Cir. 2008). The factors favoring admission included the following: Garcia Ortiz appeared to be between 25 and 30 years old, he was articulate, he did not appear to be intimidated, he was sober, and law enforcement did not appear threatening and did not make promises or misrepresentations. The factors favoring exclusion were that Garcia Ortiz had no arrest record and had not yet been given his *Miranda* warnings. Garcia Ortiz's noticeable discomfort from his false statements about how he arrived in Des Moines resulted from his own prevarication and was not attributable to the police. The court, thus, denied Garcia Ortiz's motion to suppress the evidence retrieved from the Lexus.

## 2. *Magallon*

Magallon proceeded to trial on December 10, 2018. Garcia Ortiz, cooperating with the government, testified against him. On December 12, 2018, the jury returned a guilty verdict.

Magallon filed a motion for judgment of acquittal and, alternatively, for a new trial. Magallon argued there was insufficient evidence that he entered an "agreement" to convict him for conspiracy to distribute methamphetamine. The district court concluded the record contained sufficient evidence for the jury to find that Magallon entered an agreement because (1) Garcia Ortiz testified he met up with Magallon and Estrada Camarena before driving to Des Moines so that Estrada Camarena could transfer the methamphetamine from Magallon's Infiniti to Garcia Ortiz's Lexus; (2) Garcia Ortiz testified Magallon drove Estrada Camarena to Des Moines, while Garcia Ortiz drove the drugs; and (3) the government provided evidence that Magallon purchased the Infiniti and took steps to conceal his ownership of the car and was driving the car when stopped by law enforcement. Garcia Ortiz's testimony containing prior inconsistent statements about Magallon did not render the evidence insufficient because, as the court decided, a reasonable jury could consider those statements along with the evidence.

The district court also concluded that there was sufficient evidence that Magallon took overt acts in furtherance of the drug conspiracy because Magallon (1) opened a bank account in February; (2) texted that bank account information to Estrada Camarena, into which Estrada Camarena instructed the CS to deposit the drug money; (3) received notifications from Estrada Camarena that money had been deposited into the account; (4) withdrew the money after receiving Estrada Camarena's notifications; (5) purchased the Infiniti in March 2018; (6) registered the Infiniti with a false name; (7) insured the Infiniti with a false name using the drug money from his account; (8) texted an associate to make him a fake identification card, which law enforcement found when they stopped him in Des Moines; (9) drove Estrada Camarena to Des Moines without making any stops and

in a separate car from the drugs; and (10) texted Estrada Camarena almost every day between March 16 and April 7.

Magallon also sought judgment of acquittal based on his objection to the willful blindness jury instruction. The district court rejected the argument, concluding that the willful blindness jury instruction was not given in error. The court found that the same evidence that showed he took overt acts in furtherance of the conspiracy also supported the willful blindness instruction. The district court additionally noted that Magallon was present when the plastic sacks of methamphetamine were transferred from his Infiniti to Garcia Ortiz's Lexus, indicating Magallon knew criminal activity was "particularly likely." Order Den. Mot. for Acquittal at 9, *United States v. Magallon*, 4:18-cr-00080-JAJ-CFB-2 (S.D. Iowa 2019), ECF No. 169 (quoting *United States v. Florez*, 368 F.3d 1042, 1044 (8th Cir. 2004)).

In the alternative, Magallon requested that the court grant him a new trial because the willful blindness jury instruction was given in error. The district court denied Magallon's motion for a new trial based on the willful blindness jury instruction, citing reasons similar to those supporting the denial of his motion for acquittal.

On April 12, 2019, the district court sentenced Magallon to 164 months' imprisonment.

II. *Discussion*

There are three issues on appeal: (A) whether the district court erroneously denied Garcia Ortiz's motion to suppress evidence, (B) whether the district court abused its discretion by instructing the jury on willful blindness at Magallon's trial, and (C) whether the district court erroneously denied Magallon's motion for judgment of acquittal.

-13-

## A. *Garcia Ortiz's Motion to Suppress*

Garcia Ortiz argues that the district court erred when it denied his motion to suppress evidence for three reasons: (1) officers lacked probable cause to justify the stop of the GMC Sierra; (2) officers lacked probable cause to justify the search of Garcia Ortiz's Lexus; and (3) Garcia Ortiz's post-*Miranda* statements were inadmissible. We affirm the district's denial of Garcia Ortiz's motion to suppress.

"When reviewing the denial of a motion to suppress evidence, we review legal conclusions de novo and factual findings for clear error." *United States v. Woods*, 747 F.3d 552, 555 (8th Cir. 2014). We affirm a "district court's denial of 'a motion to suppress unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 891 (8th Cir. 2020) (quoting *United States v. Garcia*, 888 F.3d 1004, 1008 (8th Cir. 2018)).

### 1. *Stop of the GMC Sierra*

Garcia Ortiz argues that law enforcement did not have probable cause to stop the GMC Sierra. Alternatively, he asserts that even if they had reasonable suspicion, law enforcement lacked the probable cause needed to exceed the limits of the investigatory stop.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

First, Garcia Ortiz argues law enforcement did not have probable cause to justify the stop of the GMC Sierra. However, the officers did not need probable cause. When the basis for a traffic stop is investigatory, law enforcement need only possess "reasonable, articulable suspicion" that a vehicle's occupants are involved in criminal activity. *United States v. Collins*, 883 F.3d 1029, 1031–32 (8th Cir. 2018) (per curiam) (quoting *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016)).

That suspicion must be objectively reasonable under the totality of the circumstances. *See id.* at 1032.

In *Collins*, law enforcement had reasonable suspicion that a suspect was engaged in criminal activity when they observed the following: (1) the suspect enter a garage around 4:30 a.m. where they knew drugs had previously been sold; (2) the suspect emerge from the garage shortly thereafter; (3) a drug dealer's motor vehicle in the garage's driveway, making it likely he was home; and (4) a high volume of traffic in the late evening and early morning hours a month prior. *Id.* at 1033. Thus, law enforcement's subsequent stop of the suspect's vehicle was "constitutionally valid." *Id.*

Similarly, in *United States v. Saenz*, officers had reasonable suspicion that a truck's passengers (who were also siblings) were involved in drug trafficking when (1) they knew a St. Charles resident sent the sister a moneygram of $3,125; (2) a confidential informant told law enforcement the sister was visiting St. Charles; (3) they confirmed the presence of the brother's car at the St. Charles resident's house; and (4) they witnessed the brother's car enter the St. Charles resident's garage and leave 30 minutes later, consistent with the unloading or loading of drugs or drug profits. 474 F.3d 1132, 1134–36 (8th Cir. 2007).

Here, the officers had an objectively reasonable suspicion that the GMC Sierra's occupants were involved in criminal activity, namely drug distribution, as in *Saenz*. In fact, officers, here, knew more information than those in *Saenz*. Law enforcement (1) received information from a CD that Estrada Camarena was involved with Darwin in distributing methamphetamine in Des Moines; (2) oversaw phone calls between Estrada Camarena and the CS and CD, arranging for Estrada Camarena to deliver ten pounds of methamphetamine to Des Moines; (3) instructed the CS to deposit payments into Magallon's bank account, which Estrada Camarena provided; (4) observed text messages from Estrada Camarena to the CS, stating Estrada Camarena was in Des Moines and wanted to meet; (5) corroborated that Estrada Camarena was in Des Moines through surveillance; (6) seized evidence from

Magallon's vehicle, further corroborating the information they previously received; (7) deduced that because they did not find the drugs in Magallon's vehicle, the methamphetamine was likely in another vehicle at Darwin's residence; and (8) observed Estrada Camarena leave Darwin's residence in the GMC Sierra with two other persons. For these reasons, we conclude that law enforcement had reasonable suspicion to conduct an investigatory traffic stop.

Next, Garcia Ortiz contends that the stop, even if lawfully initiated, became unlawful when officers exceeded its lawful scope. He alleges that they exceeded the scope by placing him—handcuffed—in the back of a locked patrol car and questioning him after making him wait about an hour. He insists that the district court misapplied the concepts in *Rodriguez*, *Collins*, *Rowe*, and *Mosley*[6] and that all items seized from the Lexus and all statements he made subsequent to the stop must be excluded. He also contends, citing his conditional plea agreement, that he should be allowed to withdraw his guilty plea. However, we find Garcia Ortiz's arguments unpersuasive.

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350 (holding, thus, that seizures justified by an observed traffic violation become unlawful when prolonged beyond the time reasonably required to issue a ticket for the violation). Whether the duration of the stop is reasonable is determined by the seizure's "mission," and law enforcement must be "reasonably diligent" in carrying out that mission. *Id.* at 354, 357 (quotation omitted). Because traffic stops implicate officer safety, law enforcement can "take certain negligibly burdensome precautions in order to complete [the] mission safely." *Id.* at 356. Those burdens will differ based on the mission. *See id.* at 357. Additionally, an officer may conduct certain unrelated inquiries absent reasonable suspicion, unless doing so "prolongs the stop." *Id.* at 355.

---

[6]*See Rodriguez v. United States*, 575 U.S. 348, 350 (2015); *Collins*, 883 F.3d 1029; *United States v. Rowe*, 878 F.3d 623 (8th Cir. 2017); *United States v. Mosley*, 878 F.3d 246, 255 (8th Cir. 2017).

"An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)). The "suspicious facts" must be "'specific and articulable facts which, taken together with rational inferences from those facts,' amount to reasonable suspicion that further investigation is warranted." *Id.* (quoting *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016)). Thus, when the mission is ongoing throughout law enforcement's interactions with the suspects of a stop, the stop will not be unreasonable when officers diligently pursue the mission and do not cause measurable delay. *Mosley*, 878 F.3d at 255. But once reasonable suspicion or probable cause dissipates, the stop must also cease. *Id.* at 253–54 (concluding the stop was not unlawfully extended when the mission was to determine a vehicle's occupants' involvement in a bank robbery, even though there were discrepancies between information officers had received and the facts on the ground).

In *Rodriguez*, the Court explained the inquiries related to a traffic-violation stop are aimed at ensuring vehicles are operating safely and responsibly. 575 U.S. at 355. In contrast, using a "dog sniff" is aimed at detecting criminal wrongdoing. *Id.* Thus, the Court held that prolonging a traffic stop based on a traffic violation to allow for a dog sniff unreasonably extends the duration of the stop. *Id.* However, the Court left open an important question for the district court to decide on remand: whether there was reasonable suspicion of criminal activity to justify detaining the defendant beyond completion of the traffic-infraction investigation. *Id.* at 358.

Here, the mission of the stop was to investigate the GMC Sierra and its passengers' involvement with drug trafficking. As in *Mosley*, the mission of the stop was ongoing throughout law enforcement's interaction with the vehicle's occupants. As the district court found, addressing the suspicion of drug activity required time. Although Garcia Ortiz waited for about an hour in the patrol car before being questioned, law enforcement reasonably pursued the mission in the meantime by

-17-

speaking first with the driver. Their conversation with Anthony led to a consent search of his cell phone. Additionally, he agreed to let law enforcement retrieve a duffel bag left at his residence. When they retrieved the bag at the residence, they also spoke with Darwin. Reviewing information on the cell phone, retrieving the duffel, and speaking with Darwin reasonably took some time and each step sustained reasonable suspicion.

When Agent Smith first spoke with Garcia Ortiz in the patrol car, their conversation lasted only about 17 minutes. During this exchange, Agent Smith pursued the stop's mission by trying to ascertain Garcia Ortiz's involvement with Estrada Camarena and his drug distribution activities. Garcia Ortiz provided Agent Smith with a fabricated story about why he was in Des Moines, how he got there, and how he ended up in the car with Anthony and Estrada Camarena.

After this, Agent Smith exited the vehicle to confer with other agents, who informed him that they found a white Lexus nearby with a Nevada license plate registered to a woman named Maria Tapia. At this point, officers had searched Magallon's car, the GMC Sierra, and the duffel bag from Darwin's residence. None of these searches recovered any methamphetamine. Because of this and the Lexus's Nevada (Estrada Camarena's known point of origin) license plate, law enforcement reasonably sought to determine the car's potential relation to the drug distribution scheme. Thus, after about three minutes from their first exchange, Agent Smith reentered the car to determine Garcia Ortiz's knowledge of the Lexus. Agent Smith quickly discovered that the Lexus belonged to Garcia Ortiz, which did not align with his previous story that he hitchhiked to Des Moines.

Reasonable suspicion clearly existed to justify the stop and remained present as further information unfolded during the stop. Additionally, Garcia Ortiz did not provide any facts indicating the officers did not diligently pursue the mission. For these reasons, we cannot conclude that the district court clearly erred when it found that "there was a wealth of information and leads to follow and the police acted diligently in doing so" and that "[a]t almost every step, the suspicion about the

detainees increased and ultimately matured into probable cause to arrest." Order Granting in Part and Den. in Part Mot. to Suppress at 6–7.

Because reasonable suspicion justified the stop and the district court did not clearly err in finding law enforcement did not exceed the mission of the stop, we affirm.

### 2. *Search of the Lexus*

Next, Garcia Ortiz argues that law enforcement unlawfully took the Lexus's keys, searched the Lexus, and seized the methamphetamine found in it. He contends he did not provide voluntary consent and that the officers did not have probable cause to search him without a warrant to retrieve his car key. As a result, he asks us to reverse the denial of his suppression motion. He also asks us to direct the district court to exclude all evidence seized from the Lexus.

If Garcia Ortiz gave voluntary consent for law enforcement to search his Lexus, then we will affirm the district court's denial of Garcia Ortiz's motion to suppress. "To show that a person consented to a search, the [g]overnment must demonstrate by a preponderance of the evidence that consent was 'the product of an essentially free and unconstrained choice.'" *Garcia-Garcia*, 957 F.3d at 895 (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). "Consent . . . may be inferred from the subject's 'words, gestures, and other conduct.'" *Id.* (quoting *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001)). Although "consent cannot be presumed from the absence of proof that a person resisted police authority or proof that the person merely acquiesced," *Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir. 1985), in certain cases consent may be implied, *see United States v. Elam*, 441 F.3d 601, 604 (8th Cir. 2006). "The issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." *Garcia-Garcia*, 957 F.3d at 892 (quoting *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018)). Put another way, the analysis turns on whether it was reasonable for the officer to believe that the suspect gave him permission to search the requested item. *See id.*

-19-

On these facts, we conclude that the district court did not err in finding that Garcia Ortiz consented to the search of the Lexus. Garcia Ortiz verbally and nonverbally consented to Agent Smith taking the keys from his pocket. When Agent Smith first asked whether "the keys in [Garcia Ortiz's] pocket open the white Lexus" and whether officers could "take a look in there," Garcia Ortiz responded that the car was "not [his] property so whatever [was] in there [was] not [his]." Gov't's Surreply to Def.'s Reply, Ex. 1 (CD) at 1:22:04; 1:22:10. Garcia Ortiz thus understood that Agent Smith wanted to search the car. Additionally, he voiced no opposition to the search, essentially disclaiming ownership of whatever might be found to maintain consistency with his initial story that the car was not his.

Garcia Ortiz, however, quickly changed his story and admitted that he owned the Lexus and that his clothes were in it. Agent Smith asked twice if he could get Garcia Ortiz's bags. Garcia Ortiz, ultimately, affirmatively stated, "yeah." *Id.* at 1:23:47. Thus, considering his words and conduct, Garcia Ortiz consented to law enforcement's opening of the Lexus and retrieval of his baggage.

The government must not only establish that the search was consensual but also that the consent given was voluntary. "A consensual search does not violate the Fourth Amendment if the consent was given voluntarily and without coercion. The government must prove voluntary consent by a preponderance of the evidence." *United States v. Carr*, 895 F.3d 1083, 1088 (8th Cir. 2018) (quotation and citation omitted), *cert. denied sub nom. Homedew v. United States*, 139 S. Ct. 1636 (2019). "The voluntariness of a consent to a search is a factual question that is reviewed for clear error." *Saenz*, 474 F.3d at 1136.

"[C]onsent is voluntary if the consenting individual had 'a reasonable appreciation of the nature and significance of his actions.'" *Id.* (quoting *United States v. Rambo*, 789 F.2d 1289, 1297 (8th Cir. 1986)). "The ultimate question is whether the individual's will has been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been

involuntary." *United States v. Johnson*, 956 F.3d 510, 516 (8th Cir. 2020) (quoting *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011)). The government must prove it was reasonable for an officer to believe the suspect's consent was not the result of "duress or coercion, express or implied." *Garcia-Garcia*, 957 F.3d at 898 (quoting *Espinoza*, 885 F.3d at 523).

Consent can be given orally or in writing. "We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary." *Saenz*, 474 F.3d at 1137. Although relevant to whether consent was voluntary, being in handcuffs, under arrest, or in custody "does not preclude a finding of voluntariness." *Comstock*, 531 F.3d at 677 (quotation omitted); *see also United States v. Chaidez*, 906 F.2d 377, 382 (8th Cir. 1990) (citing *United States v. Valasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989) (finding an individual stopped for a traffic violation, who consented while sitting in a police car, voluntarily consented to the search of her car)).

We consider the totality of the circumstances in determining voluntariness, including (1) the defendant's age, (2) the defendant's general intelligence and education, (3) whether the defendant was intoxicated, (4) whether the defendant consented after receiving *Miranda* rights, (5) whether the defendant was aware of his rights and protections because of previous arrests, (6) the length of time the subject was detained, (7) whether the officers acted in a threatening manner, (8) whether law enforcement made any promises or misrepresentations, (9) whether the defendant was in custody or under arrest at the time, (10) whether the consent occurred in public, and (11) whether the defendant was silent as the search was conducted. *Comstock*, 531 F.3d at 676–77. "We have [generally] grouped these factors into three categories: (1) the nature of the interaction between police and the defendant, (2) the personal characteristics and behavior of the defendant, and (3) the environment surrounding the defendant at the time he gave his consent." *Garcia-Garcia*, 957 F.3d at 897.

First, Garcia Ortiz argues he "did not specifically state, although asked on numerous occasions, that he gave his consent for that key to be taken from his person" and also did not say "that the key could be utilized to open the white Lexus." Garcia Ortiz's Br. at 37–38. The video evidence belies Garcia Ortiz's assertion.

Second, Garcia Ortiz argues that even if he consented to the search of the Lexus, the consent was not voluntary. Several factors weigh in Garcia Ortiz's favor. Notably, law enforcement handcuffed Garcia Ortiz and placed him in the back of a locked patrol car. Several officers were on scene. Law enforcement asked for Garcia Ortiz's consent to look in the Lexus three times before he provided consent; Garcia Ortiz had waited almost an hour before talking with police while handcuffed in the back of a patrol vehicle; he had not been Mirandized at the time he consented; he had no arrest record; no one told him he was free to leave, rather, as the district court noted, he was in custody; and Agent Smith did not tell him he could refuse to consent. He also alludes to a possible incentive offered by Agent Smith.[7]

Nevertheless, the facts support the district court's finding of voluntariness. As the district court found: (1) Garcia Ortiz appeared to be between 25 to 30 years of age; (2) he communicated clearly; (3) he did not appear to be intimidated when talking to police; (4) he was sober; and (5) though left alone for a considerable period, he was respectfully questioned for a relatively short period of time.

Although Agent Smith indicated Garcia Ortiz "might be [in trouble] too," this did not amount to a threat. Gov't's Surreply to Def.'s Reply, Ex. 1 (CD) at 1:11:22. Also, Garcia Ortiz responded to Agent Smith by offering his assistance. Agent Smith made no misrepresentations or promises by saying that he was not planning to take Garcia Ortiz to jail at that time and indicating law enforcement would need more evidence to even be able to do so.

---

[7]Garcia Ortiz alleged that Agent Smith made implied promises of leniency or misrepresentations; however, he only made this allegation with respect to his Fifth Amendment argument.

Although Garcia Ortiz was detained in the patrol vehicle for approximately 1 hour and 20 minutes before consenting, he provided consent after only about 21 minutes of questioning. He was cooperative and conversive when speaking with Agent Smith, who in turn used a non-threatening, although serious, tone. Garcia Ortiz's conversive demeanor only dissipated when he realized he had likely been caught in a lie about his travel.

In addition, he affirmatively answered "sure" when Agent Smith asked to take the Lexus keys from his pocket and affirmatively answered "yeah" that law enforcement could get his bags from the Lexus. *Id.* at 1:21:04; 1:23:47. When Agent Smith asked if Garcia Ortiz would rather law enforcement "go *look in* [the car]" before talking further, Garcia Ortiz, without objecting, answered, "You guys are welcome to do whatever you guys feel like doing." *Id.* at 1:26:19 (emphasis added); 1:26:23. He remained silent in the patrol car until Officer Smith returned a third time. Based on these considerations, the district court did not clearly err in finding Garcia Ortiz's consent to search the Lexus was voluntary.

### 3. *Garcia Ortiz's Post*-Miranda *Statements*

Lastly, Garcia Ortiz argues his post-*Miranda* statements violated his (a) Fifth and (b) Sixth Amendment rights and should have been suppressed.

### a. *Fifth Amendment Right Against Self-Incrimination*

Garcia Ortiz argues the district court erred by not suppressing his post-*Miranda* statements because they were obtained in violation of his Fifth Amendment right against self-incrimination. This issue turns on whether he voluntarily waived his Fifth Amendment right when the facts are considered under relevant precedent, including *Missouri v. Seibert*, 542 U.S. 600 (2004), and *Elstad*, 470 U.S. 298.

Generally, statements made by a person in the context of a custodial interrogation must be suppressed if that person is not first advised of his rights pursuant *Miranda*. *See Miranda*, 384 U.S. at 444. These warnings provide a procedural safeguard to secure a person's Fifth Amendment privilege against self-

incrimination. *Id.* However, a person may waive his rights if he does so "voluntarily, knowingly[,] and intelligently." *Id.*

Though the district court found Garcia Ortiz was "in custody," it concluded the presence of an initial, unwarned custodial interrogation does not demand suppression of a statement made in a subsequent custodial interrogation with the benefit of *Miranda* warnings. Order Granting in Part and Den. in Part Mot. to Suppress at 7. The admissibility of any statement given after *Miranda* warnings should turn solely on whether the statement is voluntarily and knowingly made. *See Elstad*, 470 U.S. at 298.

i. *Whether* Seibert *or* Elstad *Controls*

Assuming Garcia Ortiz was in custody for *Miranda* purposes, this case turns on whether *Seibert* or *Elstad* controls. Per *Elstad*, absent deliberate coercion in obtaining an unwarned statement, a careful and thorough administration of *Miranda* warnings cures the condition that rendered the prior unwarned statement inadmissible. *See generally Elstad*, 470 U.S. at 298. However, the Court's later ruling in *Seibert* limited *Elstad* by holding that a warned statement will be inadmissible when law enforcement uses a two-step interrogation tactic. *See generally Seibert*, 542 U.S. at 600. The two-step interrogation process is an intentional tactic by law enforcement to "circumvent *Miranda* requirements" by "deliberately" delaying the warnings "in order to provoke a confession." *United States v. Wise*, 588 F.3d 531, 536 (8th Cir. 2009) (quotation omitted).

Because Justice Kennedy's narrower concurrence controls, this circuit applies *Seibert* "only to the intentional use of a two[-]step interrogation process in an effort to circumvent *Miranda* requirements." *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007) (emphasis added); *see also id.* at 758 ("We treat Justice Kennedy's concurrence as controlling since it provided the fifth vote necessary for a majority and since it was decided on narrower grounds than the plurality opinion." (citing *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring))). When a defendant alleges his post-*Miranda* statement was obtained by a two-part interrogation, the

-24-

prosecution must establish by a preponderance of the evidence that the failure to give *Miranda* warnings at the outset was not deliberate. *Id.* at 758; *United States v. Ollie*, 442 F.3d 1135, 1142–43 (8th Cir. 2006). However, "[w]here there has been no such calculated effort, the admissibility of a post warning statement should continue to be governed by *Oregon v. Elstad*." *Torres-Lona*, 491 F.3d at 757–78 (citation omitted).

In this case, *Elstad* controls because Garcia Ortiz has not alleged, either on appeal or in his motion to suppress, that law enforcement deliberately used a two-step interrogation technique. Further, he has not explicitly alleged law enforcement used the two-step interrogation tactic. The defendant must explicitly raise the argument that law enforcement used a two-step interrogation tactic before the prosecution has the burden to prove it did not use such a tactic. *See Seibert*, 542 U.S. at 622 ("I would apply a narrower test applicable *only* in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." (emphasis added)); *Torres-Lona*, 491 F.3d at 758; *Ollie*, 442 F.3d at 1142–43. Although he discussed the deliberate elicitation of information by officers, this is solely in conjunction with his Sixth Amendment argument, and Fifth Amendment claims are not relevant to the Sixth Amendment deliberate elicitation inquiry. *See United States v. Henry*, 447 U.S. 264, 272 (1980). Thus, *Elstad* properly governs the analysis in this case.

### ii. *Whether Garcia Ortiz Voluntarily Waived His Rights*

Garcia Ortiz argues his statements were not made voluntarily because Agent Smith told Garcia Ortiz he was not under arrest before reading him his *Miranda* rights; Garcia Ortiz was handcuffed in the back of the police car for about an hour and a half when Agent Smith finally read him his rights; and Agent Smith told Garcia Ortiz that he "might not be coming with [them]," Gov't's Surreply to Def.'s Reply, Ex. 1 (CD) at 1:31:31, that people were "taking advantage of [him]," *id.* at 1:56:16, and that he was doing a "good job," *id.* at 1:56:34. He argues Agent Smith's statements were implied promises of leniency, which caused him to believe he would not be arrested if he answered Agent Smith's questions.

The government responds that Garcia Ortiz's statements were voluntary because officers made no threats and used no violence. Even if Agent Smith's statements could be considered promises of leniency, the government emphasizes that this does not preclude a finding of voluntariness.

"A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). "We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005). "Even assuming that a reasonable person would view [an officer's] statements as a promise, a promise made by law enforcement does not render a confession involuntary per se. It is simply one factor to be considered in the totality of the circumstances." *Id.* at 1041 (quotations omitted).

Factors include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011) (quotation omitted). "[T]actics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices," do not "render a confession involuntary … unless 'the overall impact of the interrogation caused the defendant's will to be overborne.'" *Brave Heart*, 397 F.3d at 1041 (quoting *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993)).

In *Brave Heart*, we concluded it was unlikely the defendant was motivated by any perceived promises. *Id*. There, the alleged promise was an officer's statement

that "it was not his intention to arrest" the defendant. *Id.* Additionally, we acknowledged that the defendant was "not a sophisticated man," but he was also not a minor, had completed the eleventh grade, had some experience with the criminal justice system, and did not have difficulty understanding the questions law enforcement asked him. *Id.*

Here, Garcia Ortiz voluntarily waived his rights. Though he did not execute a written waiver, Agent Smith asked him if he understood those rights and if he was willing to answer some questions. True, Ortiz was not experienced with the criminal justice system and was in handcuffs in the back seat of a police car at the time of the waiver. But Garcia Ortiz clearly indicated he both understood his rights and was willing to answer questions. Agent Smith told him that he was being detained for questioning but was not under arrest. Notably, Agent Smith also indicated "that c[ould] change." Gov't's Surreply to Def.'s Reply, Ex. 1 (CD) at 1:29:35. Despite also stating that "you may not be coming with us today," Agent Smith already indicated the alternative could also be true. *Id.* at 1:31:31. Thus, he did not promise that he would not arrest Garcia Ortiz in return for his cooperation. The three sessions totaled about 45 minutes. The final session lasted approximately 20 minutes and remained polite and professional. Agent Smith never threatened Garcia Ortiz nor raised his voice.

Telling Garcia Ortiz that he did a good job and that he was being taken advantage of also did not render his waiver involuntary because there is no evidence that statement overbore his will. Furthermore, Agent Smith only made these statements at the end of the interview, as he was exiting the vehicle. Such statements are even less potentially coercive than those we have already held do not invalidate voluntariness, such as deceiving a subject or using a raised voice directed at the subject. Garcia Ortiz might not have been a "sophisticated man," but as the suspect in *Brave Heart*, he was not a minor or otherwise impaired. *See Brave Heart*, 397 F.3d at 1041. He communicated with no problems and seemed able to understand Agent Smith's questions. Considering the totality of the circumstances, we affirm

the district court's denial of Garcia Ortiz's motion to suppress his post-*Miranda* statements.

### b. *Sixth Amendment Right to Counsel*

Lastly, Garcia Ortiz argues his post-*Miranda* statements should be suppressed because they violated his Sixth Amendment right to counsel. He argues that Agent Smith "deliberately elicited" incriminating statements from him in violation of the Sixth Amendment, as stated in *Henry*, 447 U.S. 264, and *Massiah v. United States*, 377 U.S. 201 (1964). Garcia Ortiz also emphasizes that he did not execute a written waiver of his rights and was interrogated twice without having advised of his right to remain silent and to request counsel.

*Henry* and *Massiah*, however, are factually distinguishable. Specifically, *Massiah* concerns a defendant's allegation that his Sixth Amendment right was violated when government agents deliberately elicited incriminating statements from him after he had been indicted and in the absence of his counsel. 377 U.S. at 204. Garcia Ortiz's Sixth Amendment claim fails because that right did not attach before Garcia Ortiz was charged with any crimes. *See Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 194 (2008) ("Th[e] Court has held that the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.").

In conclusion, with respect to Garcia Ortiz's appeal, we affirm the district court because (1) the traffic stop was supported by reasonable suspicion; (2) Garcia Ortiz voluntarily consented to the officers' removal of his car key from his pocket and to let them search the car; and (3) the admission of Garcia Ortiz's post-*Miranda* statements did not violate his Fifth or Sixth Amendment rights.

B. *Magallon's Motion for a New Trial*

Magallon first argues that the district court abused its discretion by erroneously providing a willful blindness jury instruction and therefore erred by denying his request for a new trial.

Federal Rule of Criminal Procedure 33 governs postconviction motions for a new trial. New trials are "generally disfavored." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002). They are granted "sparingly and with caution" and should only be granted when "a miscarriage of justice" may have occurred. *Id.* (quotation omitted). We review denials of these motions for abuse of discretion. *United States v. Boesen*, 599 F.3d 874, 876 (8th Cir. 2010).

"We review the district court's jury instructions for abuse of discretion. If the instructions, taken as a whole, fairly and adequately submitted the issues to the jury, we will affirm. If the instructions were erroneous, we will reverse only if the error affected the defendant's substantial rights." *United States v. Lalley*, 257 F.3d 751, 755 (8th Cir. 2001) (internal citations omitted). When considering the district court's decision to give a willful blindness instruction, we view the evidence in the light most favorable to the government. *United States v. Lewis*, 557 F.3d 601, 613 (8th Cir. 2009).

"A willful blindness instruction allows the jury to impute knowledge to a defendant of what should be obvious to him, if it found, beyond a reasonable doubt, a conscious purpose to avoid enlightenment." *Id.* (cleaned up). "A willful blindness instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance." *United States v. Whitehill*, 532 F.3d 746, 751 (8th Cir. 2008) (quoting *United States v. Gruenberg*, 989 F.2d 971, 974 (8th Cir. 1993)). It is inappropriate when the "evidence points solely to either actual knowledge or no knowledge of the facts in question. But even where there is evidence of actual knowledge, a willful blindness instruction is proper if there is sufficient evidence to support an inference of deliberate ignorance." *Lewis*, 557 F.3d at 613 (cleaned up). The "instruction is particularly appropriate when the

-29-

defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." *Id.* (quoting *United States v. Regan*, 940 F.2d 1134, 1136 (8th Cir. 1991)).

Magallon contends that the willful blindness instruction was improper in his case because the evidence only pointed in either of two ways. The evidence tended to prove either that he had actual knowledge or that he lacked any knowledge of criminal activity. In addition, he avers that there was no evidence he took any deliberate actions to bury his head in the sand. Magallon relies on *United States v. Trejo*, 831 F.3d 1090 (8th Cir. 2016), and *United States v. Barnhart*, 979 F.2d 647 (8th Cir. 1992).

In contrast, the government contends that the instruction was proper because Magallon consistently denied, and continues to deny on appeal, having any knowledge of the criminal scheme, despite strong evidence to the contrary.

When a defendant claims that he had no knowledge of criminal activity, we have repeatedly found the willful blindness instruction appropriate "even where there is evidence of actual knowledge." *See Lewis*, 557 F.3d at 613 (quotation omitted) (holding that the district court did not abuse its discretion when it provided a willful blindness instruction because the defendant "denied that he was aware of any criminal activity and the evidence in the record supports the conclusion that he either knew of the illegalities surrounding [his f]oundation or was deliberately ignorant of them"); *see also United States v. Delgrosso*, 852 F.3d 821, 828–29 (8th Cir. 2017).

In *Trejo*, the defendant argued she was not aware of any illegal drug activity occurring on her property, and the willful blindness jury instruction was improper "because the evidence could only support two conclusions—that she had actual knowledge of the alleged drug manufacturing and trafficking activity on her property, or that she had no such knowledge." 831 F.3d at 1095. We disagreed and held, "[b]ecause the evidence at trial was sufficient to establish that [the defendant]

either had actual knowledge of the methamphetamine or deliberately failed to inquire about it, the willful blindness instruction was appropriate." *Id.*

As the government states, Magallon continued to maintain that he had no knowledge of any illegal activity. As in *Trejo*, his assertion that the jury instruction was improper because the evidence could only support two conclusions—that he had actual or no knowledge—is without merit.

Whether sufficient facts suggested Magallon knew criminal activity was afoot, is reviewed "in the light most favorable to the government, drawing all reasonable inferences in the government's favor." *Lalley*, 257 F.3d at 755. "The evidence is sufficient to support the instruction if a jury could find beyond a reasonable doubt the defendants had either actual knowledge of the illegal activity or deliberately failed to inquire about it before taking action to support the activity." *Whitehill*, 532 F.3d at 751.

Here, the government provided enough evidence Magallon had either actual knowledge about methamphetamine distribution or deliberately failed to inquire about it. The government's evidence showed the following: (1) Magallon stayed in regular contact with Estrada Camarena; (2) Magallon opened a bank account and gave Estrada Camarena the account number; (3) Estrada Camarena deposited drug proceeds in Magallon's account; (4) Magallon withdrew the money from the drug proceeds immediately after Estrada Camarena informed him that money had been deposited; (5) Magallon bought a car and used the drug proceeds to insure it under a fake name; (6) Magallon also registered the car with fake information so that it had an Arizona license plate instead of a Nevada (where he actually lived) one; (7) Magallon possessed a fake Mexican identification card; (8) Magallon was present when Estrada Camarena transported the plastic sacks of methamphetamine from his Infiniti to Garcia Ortiz's Lexus; (9) Magallon drove Estrada Camarena to Des Moines without making any stops; and (10) Magallon told his girlfriend, while on the phone with her in jail, that he believed law enforcement officers would be

listening to her calls, that "there was nothing nowhere," Trial Tr., Vol. III, at 435, and that he would still be paid for the job.

This evidence indicated Magallon had knowledge of criminal activity or that it was "particularly likely" it was happening. *See Florez*, 368 F.3d at 1044. Therefore, the district court did not abuse its discretion when it provided a willful blindness jury instruction.

C. *Magallon's Motion for Acquittal*

Next, Magallon argues the district court erred when it denied his motion for judgment of acquittal because there was not sufficient evidence to support his conspiracy conviction. We affirm the district court.

In considering a motion for judgment of acquittal, this court reviews the sufficiency of the evidence de novo, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Keys*, 721 F.3d 512, 518–19 (8th Cir. 2013) (quoting *United States v. May*, 476 F.3d 638, 640–41 (8th Cir. 2007)). Motions for acquittal should only be granted when "no rational fact finder could have found the defendant guilty beyond a reasonable doubt." *United States v. Davis*, 588 F.3d 1173, 1176 (8th Cir. 2009) (quoting *United States v. Kirkie*, 261 F.3d 761, 768 (8th Cir. 2001)). The district court does not assess the credibility of witnesses or weigh evidence in deciding a motion for judgment of acquittal. *United States v. Starr*, 533 F.3d 985, 997 (8th Cir. 2008). This court does not need to ensure witness testimony was corroborated but assumes the jury found witness testimony credible that was favorable to the verdict. *See Keys*, 721 F.3d at 519–20. The district court's discretion to grant an acquittal is even more limited than its discretion to grant a new trial. *United States v. Robbins*, 21 F.3d 297, 298–99 (8th Cir. 1994).

A controlled-substance conspiracy charge requires proof of three elements: (1) that an agreement to distribute drugs existed; (2) that the defendant knew of the

agreement; and (3) that the defendant knowingly joined and participated in the conspiracy. *United States v. Saddler*, 538 F.3d 879, 887 (8th Cir. 2008). "An agreement to join a conspiracy need not be explicit but may be inferred from the facts and circumstances of the case." *Id.* (quoting *United States v. Rodriguez-Mendez*, 336 F.3d 692, 695 (8th Cir. 2003)). And "[a] defendant may be convicted for even a minor role in a conspiracy." *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1066 (8th Cir. 2010) (quoting *United States v. Lopez*, 443 F.3d 1026, 1030 (8th Cir. 2006)).

First, Magallon concedes an agreement existed between Garcia Ortiz and Estrada Camarena. Thus, Magallon attacks the conviction by questioning the establishment of elements two and three of the conspiracy charge. Second, he argues no reasonable jury could have found that he too knew of the conspiracy to distribute methamphetamine. He contends the evidence presented regarding his knowledge was insufficient. This evidence included his phone calls from jail, his presence when Estrada Camarena loaded grocery bags containing methamphetamine into Garcia Ortiz's car (though he claims not to have known what was in them), and the use of his bank account to receive drug proceeds.

This evidence, however, does not stand alone. These facts must be seen in conjunction with the many others supporting the giving of the willful blindness instruction. *See supra* Part II.B. Taken together, they constitute sufficient evidence for element two of the conspiracy charge.

Lastly, Magallon argues that there was no evidence *he* reached an agreement with anyone to distribute methamphetamine. Specifically, he asserts that the government relied on the inference that because Estrada Camarena directed his drug customer to send money to Magallon's account, then Magallon must have known of the conspiracy and participated in it. This, he contends, is insufficient evidence.

The government's response emphasizes the evidence that Magallon purchased the Infiniti—in which he drove Estrada Camarena to Des Moines—and took steps

to conceal his ownership of it. In fact, the ten facts elicited in Part II.B. are also facts the jury could have used to infer Magallon participated in the conspiracy.

Magallon relies on *United States v. Cruz*, 285 F.3d 692, 701 (8th Cir. 2002). However, the evidence in *Cruz* did not support any reasonable inferences that the defendants were guilty of conspiracy to distribute methamphetamine when (1) a jury could infer based on telephone calls that the defendant had spoken to a known drug dealer, and (2) a jury could infer the defendants knew the drug dealer. *Id.*

Unlike in *Cruz*, the government, here, offered evidence that Magallon not only had spoken to a drug dealer but that (1) he drove the drug dealer (Estrada Camarena) to another city where the dealer planned to deliver drugs; (2) he watched the drug dealer put grocery bags full of methamphetamine from his car into another car, (though he claims he did not know they had methamphetamine in them); (3) he gave his bank account number to a drug dealer, who instructed customers to deposit money for drugs in the account; and (4) he also withdrew the funds when the drug dealer notified him of deposits.

Unlike in *Cruz*, a jury could infer more than that Magallon simply had spoken to Estrada Camarena on the phone or that he merely knew Estrada Camarena. In contrast, a jury could infer Magallon drove Estrada Camarena to another city to conduct a drug deal; a jury could infer Magallon knew he was driving Estrada Camarena to conduct a drug deal because he purchased a car, using fake information, obtained an I.D. with a fake name, and drove without stopping from Las Vegas to Des Moines; and a jury could infer Magallon was paid to drive Estrada Camarena to Des Moines when Magallon told his girlfriend, while he was in jail in Des Moines, that he would still be getting paid.

On this record, we conclude a jury could reasonably infer Magallon intentionally participated in the conspiracy to distribute drugs despite his contention he was completely unaware of any illegal activity. Therefore, we affirm the district court's denial of Magallon's motion for a judgment of acquittal.

### III. *Conclusion*

In conclusion, we affirm the district court regarding all three issues. First, the district court did not err by denying Garcia Ortiz's motion to suppress. Second, the district court did not abuse its discretion when it provided the jury with a willful blindness instruction. Lastly, there was sufficient evidence to support Magallon's conspiracy conviction.

_____