# IN THE COURT OF APPEALS OF IOWA

No. 20-0370
Filed December 15, 2021

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**THEODORE W. BUSELMEIER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Appanoose County, Rose Anne Mefford, District Associate Judge (motion to suppress), and Lucy Gamon, Judge (trial).

Theodore Buselmeier appeals his convictions for possession of a controlled substance and possession of drug paraphernalia.  **AFFIRMED.**

Theodore W. Buselmeier, self-represented appellant.

Thomas J. Miller, Attorney General, and Martha E. Trout and Israel Kodiaga, Assistant Attorneys General, for appellee.

Heard by Greer, P.J., and Badding, J., and Carr, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206, (2021).

**BADDING, Judge.**

On a cold December day, a conservation officer found Minnesota resident Theodore Buselmeier standing in a creek in a wooded area clad in hunting gear. The officer was investigating a tip from the "Turn in Poachers" (TIP) hotline that a hunter the caller knew as "Ted from Minnesota" had harvested an antlered buck deer. While investigating the tip, law enforcement officials discovered marijuana and a glass pipe in Buselmeier's vehicle. Buselmeier was charged with possession of marijuana and drug paraphernalia. After his motion to suppress the drug evidence was denied, a jury found Buselmeier guilty of both charges.

On appeal, Buselmeier challenges the denial of his motion to suppress, arguing the TIP hotline call did not provide the officer with reasonable suspicion for the investigative stop. He also argues the stop was impermissibly extended. Failing the success of those issues, Buselmeier claims that there is insufficient evidence to support his convictions and that the trial court erred in instructing the jury on constructive possession. We find no merit in any of these issues and affirm Buselmeier's convictions.

## I. *Background Facts and Proceedings.*

One day after the first shotgun deer season ended in December 2018, Iowa Department of Natural Resources Conservation Officer Jacob Fulk received a phone call on the TIP hotline. The caller told the officer that another hunter, who he referred to as "Ted from Minnesota," had asked for the caller's help in removing a buck deer he had killed from a field. The caller was unsure whether the non-resident hunter had a license to kill a buck deer. The caller was also concerned

that a silver pickup truck with a Minnesota license plate he had seen in the area during the shotgun deer season remained in the area after the season concluded.

Armed with details about the hunter's vehicle and location, Officer Fulk and Iowa State Patrol Trooper Clayton Daniels followed the caller's directions and located the silver pickup truck with a Minnesota license plate. They entered the nearby field and headed in the direction the caller believed the buck deer to be. After walking for a bit, the officers stopped at a muddy deer stand to regroup when they heard a man's voice talking on a cell phone from a nearby creek bed. They followed the voice and found Buselmeier, a Minnesota resident, wearing hunting gear and standing in the creek. Buselmeier, who was by himself, claimed he was looking for a doe that he had shot the day before. Officer Fulk recognized Buselmeier from an encounter earlier in the week during which he checked Buselmeier's licensing. From that prior encounter, the officer knew that Buselmeier had a non-resident hunting license and had paid the non-resident habitat fee but only had an antlerless doe tag for Appanoose County.

Trooper Daniels stayed with Buselmeier while Officer Fulk looked for the buck. A few hundred yards from Buselmeier, Officer Fulk found a buck that was field dressed and bore the tag of another hunter.[1] According to Officer Fulk, field dressing is a common practice among hunters when harvesting an animal that involves removal of the animal's internal organs to preserve the meat. The buck appeared to the officer to be a "fresh" kill, with no evidence that wild animals had disturbed it. When Officer Fulk returned and asked Buselmeier about the buck,

---

[1] Officer Fulk later learned the hunter whose tag was affixed to the buck's antlers had been in the hospital when the deer was tagged.

Buselmeier refused to talk to him. Officer Fulk then noticed what appeared to be blood on Buselmeier's boots and pants.

The three returned to the area where their vehicles were parked. When Officer Fulk told Buselmeier he wanted to seize Buselmeier's clothing and cell phone, Buselmeier told the officer that he would need a warrant. Although Officer Fulk told Buselmeier he was not free to leave because he would be requesting that warrant, Buselmeier got into his truck and drove away.

Officer Fulk pursued Buselmeier in his patrol car. When Buselmeier finally stopped, the officer noticed that the truck's floorboard and Buselmeier's boots were wet. Officer Fulk believed Buselmeier had dumped liquid onto his boots to try to rid them of blood. He placed Buselmeier under arrest and seized his vehicle, boots, and clothing.

After obtaining a warrant, law enforcement officers searched Buselmeier's truck. In a hip pack inside a backpack on the truck's rear passenger-side seat, they found a tan, waxy substance in a container that testing showed was marijuana concentrate. They also found a plastic bag of green, leafy material that testing confirmed to be marijuana, along with a glass pipe that smelled like marijuana.

The State charged Buselmeier with possession of a controlled substance and possession of drug paraphernalia. Buselmeier moved to suppress the evidence discovered in his vehicle, which the district court denied. Following trial, a jury found Buselmeier guilty of both charges. Buselmeier appeals.

## II. Motion to Suppress.

Buselmeier challenges the denial of his motion to suppress the evidence seized from his truck. He contends that Officer Fulk did not have reasonable

suspicion to make an initial investigative stop and that he unreasonably prolonged the stop. Because information obtained during that stop was used to get the warrant to search his vehicle, Buselmeier argues the evidence found during that search is "fruit of the poisonous tree" and must be excluded.

We review the denial of a motion to suppress alleging a constitutional violation de novo. *See State v. Haas*, 930 N.W.2d 699, 701-02 (Iowa 2019). On de novo review, the court considers the entire record and independently evaluates the totality of the circumstances. *See State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001). "We give deference to the district court's fact findings due to its opportunity to assess the credibility of witnesses, but we are not bound by those findings." *Id.*

Both the state and federal constitution protect a person from unreasonable searches and seizures.[2] *See* U.S. Const. amend. IV; Iowa Const. art. I, § 8. A warrantless search and seizure is per se unreasonable unless it falls under a recognized exception to the warrant requirement. *See Baker*, 925 N.W.2d at 610. One recognized exception allows an officer to briefly detain a person for investigatory purposes. *See id.*

### A. Whether the officer had reasonable suspicion for an investigative stop.

To pass constitutional muster, an investigative stop must (1) be based on a reasonable suspicion, backed by specific and articulable facts, that a criminal act has occurred or is occurring and (2) be brief, lasting only long enough for law enforcement to confirm or dispel that suspicion. *See id.* at 610-11. Reasonable

---

[2] Because Buselmeier does not advance a distinct analytical framework under our parallel state constitutional provision, we apply the general federal framework. *See State v. Baker*, 925 N.W.2d 602, 610 (Iowa 2019).

suspicion is more than mere suspicion or curiosity but "considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.* (citation omitted).

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990). In determining the existence of reasonable suspicion, the court must independently evaluate "the totality of the circumstances as viewed by a reasonable and prudent person." *Id.* (citation omitted). The question is whether a preponderance of the evidence shows that "the stopping officer had specific and articulable facts, which taken together with rational inferences from those facts, [would lead one] to reasonably believe criminal activity may have occurred." *State v. Tague*, 676 N.W.2d 197, 204 (Iowa 2004).

In denying Buselmeier's motion to suppress, the district court found Officer Fulk had a reasonable suspicion that criminal activity was afoot based on the TIP hotline call about illegal deer hunting. Buselmeier argues the call was insufficient to provide reasonable suspicion based on *Florida v. J.L.*, 529 U.S. 266, 268 (2000). In *J.L.*, the officer's suspicion was based solely on a call made from an unknown location by an unknown caller. 529 U.S. at 270. The Supreme Court held the anonymous tip, which only described the appearance and location of a young man the caller claimed was carrying a gun, did not provide reasonable suspicion because it "lacked [a] moderate indicia of reliability." *Id.* at 268, 271. The Court distinguished the facts from those in *Alabama v. White*, which involved an

anonymous tip that a woman carrying cocaine would leave a certain apartment building at a specific time to drive a car matching a particular description to a named hotel.  *See id.* at 270 (citing *White*, 496 U.S. at 327).  Although the tip in *White* alone would not have justified an investigative stop, police corroborated it by observing that the woman moved as the informant predicted, thus providing a reason to believe the informant had inside knowledge and lending credence to the informant's claim she carried cocaine.  *See id.* (citing *White*, 496 U.S. at 332).  In contrast, the informant in *J.L.* "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility."  *Id.* at 271.  The Supreme Court emphasized that the accurate description of the suspect's appearance and location on its own was insufficient to provide reasonable suspicion:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse.  Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity.  The reasonable suspicion here at issue requires that a tip be reliable *in its assertion of illegality, not just in its tendency to identify a determinate person*.

*Id.* at 272 (emphasis added).

There are important differences that distinguish this case from *J.L.*  First, although the identity of the caller in this case is not disclosed in the record, his identity was not unknown as Officer Fulk later learned his full name and spoke with him at least twice following the initial tip.  *See id.* at 275 (Kennedy, J., concurring) ("[A] tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action."); *United States v. Hicks*, 531 F.3d

555, 559 (7th Cir. 2008) ("Courts, including our own, have distinguished *J.L.* when the tipster gives her name or other identifying information to the 911 operator."); *United States v. Brown*, 496 F.3d 1070, 1075 (10th Cir. 2007) (distinguishing unidentified 911 callers who provide enough distinctive characteristics to limit their identity to only a handful of people from the "anonymous unrecorded and undocumented telephone call" in *J.L.*). This differs from *J.L.*, which involved "an unknown, unaccountable informant." 529 U.S. at 271.

Second, from the information the caller provided to Officer Fulk in that first call, including the circumstances by which he obtained information about a possible crime, it is clear the caller was a citizen informant—the type who is generally presumed to be reliable. *See State v. Walshire*, 634 N.W.2d 625, 629 (Iowa 2001); *State v. Niehaus*, 452 N.W.2d 184, 189 (Iowa 1990) (stating the presumption "that information imparted by a citizen informant is generally reliable" but requiring "a common-sense analysis of the totality of the circumstances . . . to assess its reliability"). In contrast to the anonymous tipster in *J.L.*, the caller here explained exactly how he knew about the possible criminal activity he was reporting: he had been in direct communication with Buselmeier about moving the dead buck deer. *See Walshire*, 634 N.W.2d at 629 (discussing cases distinguishing *J.L.* on the same basis); *see also State v. Drake*, 224 N.W.2d 476, 478 (Iowa 1974) (noting the rule of prior reliability required for confidential informants is considerably relaxed for citizen informants because "unlike the professional informant, he is without motive to exaggerate, falsify or distort the facts to serve his own ends").

Buselmeier emphasizes that the caller did not know for certain that a crime had been committed and was instead just voicing a concern that something illegal could be happening. But the caller also explained the reasons for his concern: (1) Buselmeier contacted the caller to seek assistance retrieving a deer, which indicated he had not been in a hunting party, (2) he provided the caller with a photo of an antlered buck deer, and (3) Buselmeier remained in the area even though he was not a resident of the state and the shotgun hunting season had ended. This is significantly more information than the police were acting on in *J.L.*, where the anonymous caller "neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." 529 U.S. at 271 (2000).

And, unlike *J.L.*, Officer Fulk corroborated more than just Buselmeier's location and appearance. The caller was unable to pronounce Buselmeier's last name but used the first name of "Ted" and described him as being from Minnesota. He accurately described the location of Buselmeier's silver pickup truck, which bore Minnesota license plates. On finding Buselmeier in the approximate location the caller identified, Officer Fulk recognized him from a prior interaction and knew he had a non-resident license to hunt antlerless deer. Based on the caller's report that Buselmeier sought help removing the buck deer, Officer Fulk could reasonably conclude that Buselmeier was not a member of a hunting party when he shot the deer and therefore had no legal basis to do so.

Buselmeier complains that Officer Fulk failed to "negate the numerous *legal* possibilities allowing for the alleged conduct." But "reasonable cause may exist to investigate conduct which is subject to a legitimate explanation and turns out to be wholly lawful." *State v. Kreps*, 650 N.W.2d 636, 642 (Iowa 2002) (citation omitted).

Indeed, the "principal function of an investigatory stop is to resolve the ambiguity as to whether criminal activity is afoot." *Id.* (citation omitted). After reviewing state and federal rulings examining what constitutes reasonable suspicion, our supreme court observed in *State v. Struve* that "the officer's suspicion need not be infallible or even rise to a fifty-fifty chance the individual is engaged in criminal activity to be reasonable." 956 N.W.2d 90, 98 (Iowa 2021), *reh'g denied* (Apr. 6, 2021), *petition for cert. filed*, 2021 WL 4122246 (U.S. Sept. 8, 2021) (No. 21-374).

Based on the information Officer Fulk learned from the caller and independently corroborated, we agree he had a reasonable suspicion that Buselmeier had illegally taken a buck deer, thereby justifying an investigative stop.

### B. Whether the officer impermissibly extended the investigative stop.

Buselmeier next contends that even if Officer Fulk had a reasonable suspicion for an investigative stop, he impermissibly extended the stop by having him wait with the trooper while Officer Fulk looked for the buck deer.[3] *See id.* (stating that once law enforcement "become[s] aware of additional facts that make their suspicions of illegal activity unreasonable, the reasonableness of the initial suspicion dissipates and they cannot make the stop"). He notes that when Officer Fulk first initiated the stop, he saw that Buselmeier was unarmed and talking on

---

[3] The State argues that Buselmeier failed to preserve error on this claim because he raises a different argument on appeal than he raised below. In his motion to suppress, Buselmeier claimed that Officer Fulk "impermissibly extended the stop *by pursuing the Defendant [in his vehicle] after the initial investigatory stop*." (Emphasis added.) But on appeal, Buselmeier focuses on an earlier point in the investigative stop—after the officer made initial contact with Buselmeier before setting out to look for the buck deer—as the point when initial suspicion should have dissipated. We elect to bypass this error preservation concern and proceed to the merits. *See State v. Taylor*, 596 N.W.2d 55, 56 (Iowa 1999)*.*

his cellphone with no blood on his hands or shirt. He claims these facts "significantly undermined any reasonable suspicion that Buselmeier was illegally hunting."[4]

Whether the duration of a stop is reasonable "is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354, 357 (2015)); *see also State v. McCoy*, 692 N.W.2d 6, 18 (Iowa 2005). It must last no longer than is necessary to effectuate its purpose, using the least intrusive investigative methods reasonably available to verify or dispel the officer's suspicion. *See McCoy*, 692 N.W.2d at 18. "An officer's suspicion of criminal activity may reasonably grow over the course of a . . . stop as the circumstances unfold and more suspicious facts are uncovered." *Magallon*, 984 F.3d at 1278 (citation omitted). On those occasions "when the mission is ongoing throughout law enforcement's interactions with the suspects of a stop, the stop will not be unreasonable when officers diligently pursue the mission and do not cause measurable delay." *Id.*

We have already determined that Officer Fulk had reasonable suspicion for the initial investigative stop of Buselmeier. The mission of that stop was to investigate illegal deer hunting. While Buselmeier was waiting by the creek, Officer

---

[4] Buselmeier also argues that he provided a legal explanation for his presence in the area by telling Officer Fulk he was looking for a doe he killed the day before. But Officer Fulk did not have to accept that explanation. *See Struve*, 956 N.W.2d at 104 ("[R]easonable suspicion does not require an officer to rule out all innocent explanations. 'The need to resolve ambiguous factual situations—ambiguous because the observed conduct could be either lawful or unlawful—is a core reason the Constitution permits investigative stops.'" (citation omitted)).

Fulk was reasonably pursuing his mission by looking for the buck deer. Once he located it, the caller's version of events was confirmed—that Buselmeier was looking for assistance in retrieving a buck deer. Based on its condition, Officer Fulk concluded the buck deer had been killed recently. Officer Fulk then returned to Buselmeier and noticed what appeared to be blood on Buselmeier's boots and pants.

These facts show that Officer Fulk was diligently pursuing the mission of the stop while Buselmeier was detained, unlike cases that have found investigative stops to have been unconstitutionally prolonged. *See, e.g.*, *In re Pardee*, 872 N.W.2d 384, 391 (Iowa 2015) (finding an officer developed reasonable suspicion of other criminal activity only by prolonging the initial stop beyond the time reasonably necessary to execute the traffic violation warnings); *accord Rodriguez*, 575 U.S. at 354. We accordingly find reasonable suspicion existed to justify the continued detention of Buselmeier by the creek while Officer Fulk attempted to locate the deer.

### C. Whether the application for the search warrant included evidence obtained during an unconstitutional seizure.

Finally, Buselmeier contends the district court erred in denying his motion to suppress because the warrant to search his vehicle was obtained with information acquired during the unconstitutional investigatory stop. As we have already determined that Officer Fulk had reasonable suspicion for the investigative stop, this argument fails. *See State v. Bergmann*, 633 N.W.2d 328, 333 (Iowa 2001) ("The fruit of the poisonous tree doctrine bars evidence found in subsequent searches only when the evidence was found by virtue of the first illegality.").

### III.    *Admissibility of Drug Evidence.*

Buselmeier next claims the "district court erred in admitting evidence of [his] vehicle and the Department of Criminal Investigations (DCI) lab results because of a deficient chain of custody." The State counters that Buselmeier failed to preserve error on his chain-of-custody claims because he never raised them to the trial court. We agree.

At trial, Buselmeier lodged a general foundation objection to the admission of the DCI lab report into evidence. When the trial court asked, "What is wrong with the foundation?" Buselmeier responded, "It is not necessarily qualifications, but scientific—the science on it. . . ." This did not alert the court to the chain-of-custody deficiencies Buselmeier raises on appeal, specifically his contention that the State failed "to account for continuous custody" of the vehicle and the drug evidence recovered from the vehicle. *See State v. Don*, 318 N.W.2d 810, 805 (Iowa 1982) (finding a general objection to the foundation for an exhibit was inadequate to preserve error on a chain-of-custody challenge).

Buselmeier is not saved by the chain-of-custody concerns raised in his motion for judgment of acquittal. This is because a motion for judgment of acquittal is a means for challenging the sufficiency of the evidence to support a conviction, not its admissibility. *See State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008). Buselmeier is thus precluded from challenging the admissibility of this evidence on appeal by arguing the State failed to establish chain of custody. *See State v. Dessinger*, 958 N.W.2d 590, 598 (Iowa 2021) ("The preservation of error doctrine is grounded in the idea that a specific objection to the admission of evidence be

made known, and that the trial court be given on opportunity to pass upon the objection and correct any error." (citation omitted)).

## IV.    *Sufficiency of the Evidence.*

Buselmeier also challenges the denial of his motion for judgment of acquittal, arguing the State presented insufficient evidence to support his convictions. We review this claim for correction of errors at law. *See State v. Evans*, 671 N.W.2d 720, 724 (Iowa 2003). We uphold a verdict if it is supported by substantial evidence. *See State v. Warren*, 955 N.W.2d 848, 856 (Iowa 2021). Substantial evidence is evidence that would convince a rational person that the defendant is guilty beyond a reasonable doubt. *See id.* In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, including any legitimate inferences and presumptions that can be fairly and reasonably deduced from it. *See id.*

In order for the jury to find Buselmeier guilty of possession of a controlled substance, the jury was instructed that the State had to prove:

> 1. On or about December 6, 2018, the defendant knowingly or intentionally possessed marijuana, a controlled substance.
> 2. The defendant knew that the substance he possessed was marijuana.

The jury was further instructed that to find him guilty of possession of drug paraphernalia, the State had to prove Buselmeier "knowingly or intentionally possessed drug paraphernalia." The court instructed the jury on possession:

> The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may have sole or joint possession.
> A person who has direct physical control over a thing on his person is in actual possession of it.

A person, who, although not in actual possession, has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is in constructive possession of it. A person's mere presence at a place where a thing is found or proximity to the thing is not enough to support a conclusion that the person possessed the thing.

If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

Whenever the word "possession" has been used in these instructions, it includes actual as well as constructive possession and sole as well as joint possession.

Buselmeier challenges the sufficiency of the evidence that he possessed marijuana or drug paraphernalia. He argues the State failed to prove he had knowledge of and control over either. He admits that the marijuana and drug paraphernalia were found inside his vehicle in a hip pack that was inside a backpack. But he argues there was no evidence of his personal effects with the marijuana or paraphernalia to show he was in exclusive possession. He also claims other people may have accessed his vehicle.

Viewing the evidence in the light most favorable to upholding the verdict, there is substantial evidence by which the jury could find Buselmeier had knowledge of and control over the marijuana. Both were located in his vehicle, and Buselmeier was alone when Officer Fulk located him. The evidence suggests Buselmeier had been hunting alone in the days before. Although Buselmeier speculates an unknown person may have accessed his truck and placed the items on the backseat, the jury could reasonably reject this claim. *See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) ("The jury is free to believe or disbelieve any testimony as it chooses and give weight to the evidence as in its judgment such evidence should receive."); *see also State v. Musser,* 721 N.W.2d 758, 761 (Iowa

2006) ("It is not the province of the court . . . to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury.").

Buselmeier also challenges the DCI lab report that identified the substances found in his vehicle as marijuana. The court admitted the test results over Buselmeier's objection that the State had no provided a sufficient foundation as to the testing process. Buselmeier then cross-examined the DCI criminalist who conducted the test about her testing methods. To the extent that the jury found the test results identifying the marijuana credible, there is nothing in the record that calls those results or the testimony by the DCI criminalist into doubt sufficiently to allow us to substitute our judgment for that of the jury. *See State v. DeRaad*, 164 N.W.2d 108, 112 (Iowa 1969) ("It is only when evidence which the trier of the fact has relied upon is inherently or patently incredible that this court will substitute its judgment for that of the fact finder."); *State v. Neitzel*, 801 N.W.2d 612, 624 (Iowa Ct. App. 2011) ("[T]he credibility of witnesses is for the factfinder to decide except those rare circumstances where the testimony is absurd, impossible, or self-contradictory.").

## V. *Jury Instruction Regarding Constructive Possession.*

Finally, Buselmeier challenges the trial court's refusal to give his more expansive proposed jury instruction on constructive possession. "[W]e generally review a district court's refusal to give a requested jury instruction for errors at law . . . ." *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). In doing so, we consider the jury instructions as a whole. *See State v. Davis*, 951 N.W.2d 8, 17 (Iowa 2020). "The district court must submit 'a requested jury instruction if it

correctly states the applicable law and is not embodied in other instructions.'" *State v. Benson*, 919 N.W.2d 237, 246-47 (Iowa 2018) (citation omitted).

We find no error in the trial court's refusal to give the requested possession instruction. Some of the language of the requested instruction is substantially similar to that contained in the instruction the trial court gave the jury. The requested instruction differs by including factors the jury may consider in situations where a controlled substance is found in a place occupied by multiple people. But the facts do not support giving such an instruction because there is no evidence that anyone other than Buselmeier occupied his vehicle. As such, we find no error.

## VI. *Conclusion.*

We affirm Buselmeier's convictions for possession of a controlled substance and possession of drug paraphernalia.

**AFFIRMED.**